Dan COHEN, Petitioner, Respondent (C8–88–2631, C0–88–2672),

v.

COWLES MEDIA COMPANY, d/b/a Minneapolis Star and Tribune Company, Petitioner, Appellant (C8–88–2631), Defendant (C0–88–2672),

Northwest Publications, Inc., Petitioner, Defendant (C8–88–2631), Appellant (C0–88–2672).

Nos. C8–88–2631, C0–88–2672.

Supreme Court of Minnesota.

July 20, 1990.

Paul R. Hannah, St. Paul, for Northwest Publications, Inc.

John Borger, Faegre & Benson, Minneapolis, for Cowles Media, et al.

Elliot C. Rothenberg, Minneapolis, for respondent.

Mark R. Anfinson, Minneapolis, amicus curiae Associated Press.

SIMONETT, Justice.

This case asks whether a newspaper's breach of its reporter's promise of anonymity to a news source is legally enforceable. We conclude the promise is not enforceable, neither as a breach of contract claim nor, in this case, under promissory estoppel. We affirm the court of appeals' dismissal of plaintiff's claim based on fraudulent misrepresentation, and reverse the court of appeals' allowance of the breach of contract claim.

Claiming a reporter's promise to keep his name out of a news story was broken, plaintiff Dan Cohen sued defendants Northwest Publications, Inc., publisher of the St. Paul Pioneer Press Dispatch (Pioneer Press), and Cowles Media Company, publisher of the Minneapolis Star and Tribune (Star Tribune). The trial court ruled that the First Amendment did not bar Cohen's contract and misrepresentation claims. The jury then found liability on both claims and awarded plaintiff $200,000 compensatory damages jointly and severally against the defendants. In addition, the jury awarded punitive damages of $250,000 against each defendant.

The court of appeals (2–1 decision) agreed that plaintiff's claims did not involve state action and therefore did not implicate the First Amendment; further, that even if First Amendment rights were implicated, those rights were outweighed by compelling state interests and, in any event, such rights were waived by the newspapers. The appeals panel ruled, however, that misrepresentation had not been proven as a matter of law and, therefore, set aside the punitive damages award. The panel upheld the jury's finding of a breach of contract and affirmed the award of $200,000 compensatory damages. *Cohen v. Cowles Media Co.*, 445 N.W.2d 248 (Minn.App.1989). We granted petitions for further review from all parties.

On October 27, 1982, in the closing days of the state gubernatorial election campaign, Dan Cohen separately approached Lori Sturdevant, the Star Tribune reporter, and Bill Salisbury, the Pioneer Press reporter, and to each stated in so many words:

> I have some documents which may or may not relate to a candidate in the upcoming election, and if you will give me a promise of confidentiality, that is that I will be treated as an anonymous source, that my name will not appear in any material in connection with this, and you will also agree that you're not going to pursue with me a question of who my source is, then I'll furnish you with the documents.

Sturdevant and Salisbury were experienced reporters covering the gubernatorial election and knew Cohen as an active Republican associated with the Wheelock Whitney campaign. Cohen told Sturdevant that he would also be offering the documents to other news organizations. Neither reporter informed Cohen that their promises of confidentiality were subject to approval or revocation by their editors. Both reporters promised to keep Cohen's identity anonymous, and both intended to keep that promise. At trial Cohen testified he insisted on anonymity because he feared retaliation from the news media and politicians. Cohen turned over to each reporter copies of two public court records concerning Marlene Johnson, the DFL candidate for lieutenant governor. The first was a record of a 1969 case against Johnson for three counts of unlawful assembly, subsequently dismissed; the second document was a 1970 record of conviction for petit theft, which was vacated about a year la-

ter.[1]

Both newspapers, on the same day, then interviewed Marlene Johnson for her explanation and reaction. The Star Tribune also assigned a reporter to find the original court records in the dead-storage vaults. The reporter discovered that Gary Flakne, known to be a Wheelock Whitney supporter, had checked out the records a day earlier; no one, before Flakne, had looked at the records for years. The reporter called Flakne and asked why he had checked out the records. Flakne replied, "I did it for Dan Cohen." The Star Tribune editors thereafter conferred and decided to publish the story the next day including Dan Cohen's identity. Acting independently, the Pioneer Press Dispatch editors also decided to break their reporter's promise and to publish the story with Cohen named as the source.[2]

The decision to identify Cohen in the stories was the subject of vigorous debate within the editorial staffs of the two newspapers. Some staff members argued that the reporter's promise of confidentiality should be honored at all costs. Some contended that the Johnson incidents were not newsworthy and did not warrant publishing, and, in any case, if the story was published, it would be enough to identify the source as a source close to the Whitney campaign. Other editors argued that not only was the Johnson story newsworthy but so was identification of Cohen as the source; that to attribute the story to a

veiled source would be misleading and cast suspicion on others; and that the Johnson story was already spreading throughout the news media community and was discoverable from other sources not bound by confidentiality. Then, too, the Star Tribune had editorially endorsed the Perpich–Johnson ticket; some of its editors feared if the newspaper did not print the Johnson story, other news media would, leaving the Star Tribune vulnerable to a charge it was protecting the ticket it favored. Salisbury and Sturdevant both objected strongly to the editorial decisions to identify Cohen as the source of the court records. Indeed, Sturdevant refused to attach her name to the story.

Promising to keep a news source anonymous is a common, well-established journalistic practice. So is the keeping of those promises. None of the editors or reporters who testified could recall any other instance when a reporter's promise of confidentiality to a source had been overruled by the editor. Cohen, who had many years' experience in politics and public relations,[3] said this was the first time in his experience that an editor or a reporter did not honor a promise to a source.

The next day, October 28, 1982, both newspapers published stories about Johnson's arrests and conviction. Both articles published Cohen's name, along with denials by the regular Whitney campaign officials of any connection with the published stories. Under the headline, *Marlene John-*

1. Cohen then met with reporters for the Associated Press and WCCO–TV. They, too, promised Cohen anonymity and received the court documents. The Associated Press published the story and honored its promise. WCCO–TV did not run the story.

2. The court records obtained by Cohen did not contain the underlying facts of the unlawful assembly and petit theft charges. Apparently only after the reporters had gone to Johnson for an explanation did the full story become known. Johnson explained (and the newspapers duly reported in their stories) that the arrest for unlawful assembly (later dismissed) was for protesting the city's alleged failure to hire minority workers on construction projects, while the petit theft incident (theft up to $150) was for leaving a store with $6 of sewing materials at a time when Johnson was upset because

of her father's death. These circumstances, of which Cohen was apparently unaware and which cast a somewhat different light on the two incidents, were likely to set in motion a boomerang effect. This suggestion of a boomerang may have prompted some of the editors to believe that Cohen's identity was newsworthy.

3. Cohen would qualify as a public figure. For many years Cohen had been active in politics as a campaign worker, a candidate, and as an elected public official. In 1982 he was a Whitney supporter and was employed as a public relations officer with a Minneapolis advertising firm which was handling some work for the Whitney campaign. Additionally, he had been a lawyer, stock broker, public relations official, author, and freelance newspaper columnist.

son arrests disclosed by Whitney ally, the Star Tribune also gave Johnson's explanation of the arrests and identified Cohen as a "political associate of IR gubernatorial candidate Wheelock Whitney" and named the advertising firm where Cohen was employed. The Pioneer Press Dispatch quoted Johnson as saying the release of the information was "a last-minute smear campaign."

The same day as the two newspaper articles were published, Cohen was fired by his employer. The next day, October 29, a columnist for the Star Tribune attacked Cohen and his "sleazy" tactics, with, ironically, no reference to the newspaper's own ethics in dishonoring its promise. A day later the Star Tribune published a cartoon on its editorial page depicting Dan Cohen with a garbage can labeled "last minute campaign smears."

Cohen could not sue for defamation because the information disclosed was true. He couched his complaint, therefore, in terms of fraudulent misrepresentation and breach of contract. We now consider whether these two claims apply here.

## I.

■ First of all, we agree with the court of appeals that the trial court erred in not granting defendants' post-trial motions for judgment notwithstanding the verdict on the misrepresentation claim.

■ For fraud there must be a misrepresentation of a past or present fact. A representation as to future acts does not support an action for fraud merely because the represented act did not happen, unless the promisor did not intend to perform at the time the promise was made. *Vande-*

putte v. Soderholm, 298 Minn. 505, 508, 216 N.W.2d 144, 147 (1974). Cohen admits that the reporters intended to keep their promises, as, indeed, they testified and as their conduct confirmed. Moreover, the record shows that the editors had no intention to reveal Cohen's identity until later when more information was received and the matter was discussed with other editors. These facts do not support a fraud claim. For this reason and for the other reasons cited by the court of appeals, we affirm the court of appeals' ruling. Because the punitive damages award hinges on the tort claim of misrepresentation, it, too, must be set aside as the court of appeals ruled.

## II.

■ A contract, it is said, consists of an offer, an acceptance, and consideration. Here, we seemingly have all three, plus a breach. We think, however, the matter is not this simple.

Unquestionably, the promises given in this case were intended by the promisors to be kept. The record is replete with the unanimous testimony of reporters, editors, and journalism experts that protecting a confidential source of a news story is a sacred trust, a matter of "honor," of "morality," and required by professional ethics. Only in dire circumstances might a promise of confidentiality possibly be ethically broken,[4] and instances were cited where a reporter has gone to jail rather than reveal a source. The keeping of promises is professionally important for at least two reasons. First, to break a promise of confidentiality which has induced a source to give information is dishonorable. Second-

---

**4.** Two possible instances where a promise of confidentiality might be ethically breached have been suggested: (1) where disclosure is required to correct misstatements made by the source; and (2) where failure to reveal the source may subject the newspaper to substantial libel damages. *See* M. Langley & L. Levine, *Broken Promises,* Colum. Journalism Rev. 21 (July/August 1988). As an example of the first instance, the authors cite Oliver North's public hearing testimony that the leaking of information about the *Achille Lauro* hijacking seriously compromised intelligence activities, whereupon News-

week disclosed that North himself was the anonymous source of the leak. *Id.* In some civil libel actions, says the article, where the reporter refuses to reveal his or her confidential source of allegedly defamatory information, the court has threatened to enter a default judgment against the defendant newspaper, thereby exposing the newspaper to heavy damages. *Id.* at 22.

Another difficulty sometimes encountered is that the newspaper, being free to state who is *not* the confidential source, may enable members of the public, by a process of elimination, to identify the source. *Id.*

ly, if it is known that promises will not be kept, sources may dry up. The media depend on confidential sources for much of their news; significantly, at least up to now, it appears that journalistic ethics have adequately protected confidential sources.

The question before us, however, is not whether keeping a confidential promise is ethically required but whether it is legally enforceable; whether, in other words, the law should superimpose a legal obligation on a moral and ethical obligation. The two obligations are not always coextensive.

The newspapers argue that the reporter's promise should not be contractually binding because these promises are usually given clandestinely and orally, hence they are often vague, subject to misunderstanding, and a fertile breeding ground for lawsuits. *See Ruzicka v. Conde Nast Publications, Inc.*, 733 F.Supp. 1289, 1300–01 (D.Minn.1990) (a promise not to make a source identifiable found too vague to be enforceable). Perhaps so, and this may be a factor to weigh in the balance; but this objection goes only to problems of proof, rather than to the merits of having such a cause of action at all. Moreover, in this case at least, we have a clear-cut promise.

■ The law, however, does not create a contract where the parties intended none. *Linne v. Ronkainen*, 228 Minn. 316, 320, 37 N.W.2d 237, 239 (1949). Nor does the law consider binding every exchange of promises. *See, e.g.*, Minn.Stat. ch. 553 (1988) (abolishing breaches of contract to marry); *see also* Restatement (Second) of Contracts §§ 189–91 (1981) (promises impairing family relations are unenforceable). We are not persuaded that in the special milieu of media newsgathering a source and a reporter ordinarily believe they are engaged in making a legally binding contract. They are not thinking in terms of offers and acceptances in any commercial or business sense. The parties understand that the reporter's promise of anonymity is given as a moral commitment, but a moral obligation alone will not support a contract. *See Cruickshank v. Ellis*, 178 Minn. 103, 107, 226 N.W. 192, 194 (1929). Indeed, a payment of money which taints the integri-

ty of the newsgathering function, such as money paid a reporter for the publishing of a news story, is forbidden by the ethics of journalism.

What we have here, it seems to us, is an "I'll-scratch-your-back-if-you'll-scratch-mine" accommodation. The source, for whatever reasons, wants certain information published. The reporter can only evaluate the information after receiving it, which is after the promise is given; and the editor can only make a reasonable, informed judgment after the information received is put in the larger context of the news. The durability and duration of the confidence is usually left unsaid, dependent on unfolding developments; and none of the parties can safely predict the consequences of publication. *See supra* note 4. Each party, we think, assumes the risks of what might happen, protected only by the good faith of the other party.

In other words, contract law seems here an ill fit for a promise of news source confidentiality. To impose a contract theory on this arrangement puts an unwarranted legal rigidity on a special ethical relationship, precluding necessary consideration of factors underlying that ethical relationship. We conclude that a contract cause of action is inappropriate for these particular circumstances.

### III.

■ But if a confidentiality promise is not a legally binding contract, might the promise otherwise be enforceable? In *Christensen v. Minneapolis Mun. Employees Retirement Bd.*, 331 N.W.2d 740, 747 (Minn.1983), we declined to apply a "conventional contract approach, with its strict rules of offer and acceptance" in the context of public pension entitlements, pointing out this approach "tends to deprive the analysis of the relationship between the state and its employees of a needed flexibility." We opted instead for a promissory estoppel analysis. The doctrine of promissory estoppel implies a contract in law where none exists in fact. According to the doctrine, well-established in this state, a promise expected or reasonably

expected to induce definite action by the promisee that does induce action is binding if injustice can be avoided only by enforcing the promise.[5]

In our case we have, without dispute, the reporters' unambiguous promise to treat Cohen as an anonymous source. The reporters expected that promise to induce Cohen to give them the documents, which he did to his detriment. The promise applied only to Cohen's identity, not to anything about the court records themselves.

We are troubled, however, by the third requirement for promissory estoppel, namely, the requirement that injustice can only be avoided by enforcing the promise. Here Cohen lost his job; but whether this is an injustice which should be remedied requires the court to examine a transaction fraught with moral ambiguity. Both sides proclaim their own purity of intentions while condemning the other side for "dirty tricks." Anonymity gives the source deniability, but deniability, depending on the circumstances, may or may not deserve legal protection. If the court applies promissory

estoppel, its inquiry is not limited to whether a promise was given and broken, but rather the inquiry is into all the reasons why it was broken.

Lurking in the background of this case has been the newspapers' contention that any state-imposed sanction in this case violates their constitutional rights of a free press and free speech.[6] Under the contract analysis earlier discussed, the focus was more on whether a binding promise was intended and breached, not so much on the contents of that promise or the nature of the information exchanged for the promise. *See* Restatement (Second) of Contracts, ch. 8, introductory note (1981) ("In general, parties may contract as they wish, and courts will enforce their agreements without passing on their substance."). Thus the court of appeals, using a contract approach, concluded that applying "neutral principles" of contract law either did not trigger First Amendment scrutiny or, if it did, the state's interest in freedom of contract outweighed any constitutional free press rights. 445 N.W.2d at 254–57.[7] Be-

---

5. *AFSCME Councils 6, 14, 65 and 96, AFL–CIO v. Sundquist,* 338 N.W.2d 560, 568 (Minn.1983), *appeal dismissed, Minneapolis Police Relief Ass'n v. Sundquist,* 466 U.S. 933, 104 S.Ct. 1902, 80 L.Ed.2d 452 (1984); *Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn.1981) (a health clinic reneging on a job offer to a pharmacist who had quit his job and turned down another job in reliance on the clinic's offer); *Northwestern Bank of Commerce v. Employers' Life Ins. Co. of America,* 281 N.W.2d 164, 166 (Minn.1979) (a life insurer breaching a promise to notify a bank, which had taken the policy as collateral, of a default on premiums, resulting in lapse of the policy); *see also* Restatement (Second) of Contracts § 90(1) (1981). The measure of damages also appears to be more flexible than for breach of contract. ("The remedy granted for breach may be limited as justice requires." *Id.*)

This theory was not briefed by the parties but it surfaced during oral argument.

6. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), holds that a state may not apply a state rule of law to impose impermissible restrictions on the federal constitutional freedoms of speech and press. The test is not the form which the state action takes—such as in this case, breach of contract or promissory estoppel—but, "whatever the form, whether such power has in fact been exercised." *Id.* at 265, 84 S.Ct. at 718.

The defendant newspapers rely on *New York Times* and its progeny, plus *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), where state law enforcement of a private covenant was held to violate constitutional rights of third parties. Plaintiff, on the other hand, relies on cases such as *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); *Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980); and *The Florida Star v. B.J.F.,* — U.S. ——, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), to make his argument that there are occasions where the First Amendment allows restraints on true information, especially when the restraint was voluntarily assumed by the newspaper or when the information was "unlawfully obtained" by the newspaper.

7. The doctrine of "neutral principles," for example, has been used to permit state contract and property law to decide ownership of church property when church members are divided over doctrine, notwithstanding the First Amendment prohibition against state entanglement in religion. *See Jones v. Wolf,* 443 U.S. 595, 603–04, 99 S.Ct. 3020, 3025–26, 61 L.Ed.2d 775 (1979); *but cf. Kaufmann v. Sheehan,* 707 F.2d 355, 358–59 (8th Cir.1983) (plaintiff's employment as a priest, while having secular aspects, involved "inherently religious issues" to be left to church authorities). Even so, as the Restate-

cause we decide that contract law does not apply, we have not up to now had to consider First Amendment implications. But now we must. Under a promissory estoppel analysis there can be no neutrality towards the First Amendment. In deciding whether it would be unjust not to enforce the promise, the court must necessarily weigh the same considerations that are weighed for whether the First Amendment has been violated. The court must balance the constitutional rights of a free press against the common law interest in protecting a promise of anonymity.

For example, was Cohen's name "newsworthy"? Was publishing it necessary for a fair and balanced story? Would identifying the source simply as being close to the Whitney campaign have been enough? The witnesses at trial were sharply divided on these questions. Under promissory estoppel, the court cannot avoid answering these questions, even though to do so would mean second-guessing the newspaper editors. *See, e.g., Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) ("The choice of material to go into a newspaper * * * constitute[s] the exercise of editorial control and judgment," a process critical to the First Amendment guarantees of a free press.). Of critical significance in this case, we think, is the fact that the promise of anonymity arises in the classic First Amendment context of the quintessential public debate in our democratic society, namely, a political source involved in a political campaign. The potentiality for civil damages for promises made in this context chills public debate, a debate which Cohen willingly entered albeit hoping to do so on his own terms. In this context, and considering the nature of the political story involved, it seems to us that the law best leaves the parties here to their trust in each other.

We conclude that in this case enforcement of the promise of confidentiality under a promissory estoppel theory would violate defendants' First Amendment rights. In cases of this kind, the United States Supreme Court has said it will proceed cautiously, deciding only in a "discrete factual context." *The Florida Star v. B.J.F.*, —— U.S. ——, ——, 109 S.Ct. 2603, 2607, 105 L.Ed.2d 443 (1989). We, too, are not inclined to decide more than we have to decide. There may be instances where a confidential source would be entitled to a remedy such as promissory estoppel, when the state's interest in enforcing the promise to the source outweighs First Amendment considerations, but this is not such a case. Plaintiff's claim cannot be maintained on a contract theory. Neither is it sustainable under promissory estoppel. The judgment for plaintiff is reversed.

Affirmed in part and reversed in part.

POPOVICH, C.J., while presiding at oral argument, took no part in the consideration and decision of this matter.

YETKA, Justice (dissenting).

I would affirm the court of appeals and allow Cohen to recover on either a contract or promissory estoppel theory. The simple truth of the matter is that the appellants made a promise of confidentiality to Cohen in consideration for information they considered newsworthy. That promise was broken and, as a direct consequence, Cohen lost his job. Under established rules of contract law, the appellants should be responsible for the consequences of that broken promise. The first amendment is being misused to avoid liability under the doctrine of promissory estoppel. The result of this is to carve out yet another special privilege in favor of the press that is denied other citizens.

I dissent because I believe that the news media should be compelled to keep their promises like anyone else. If they did not intend to keep the promise they made to Cohen, they should not have made it or should have refused to use the proffered information. Alternatively, after accepting the information subject to the confidentiali-

ment goes on to say in the passage quoted above in the text, there may be instances where "the interest in freedom of contract is outweighed by some overriding interest of society * * *." Restatement (Second) of Contracts, ch. 8, introductory note (1981).

ty agreement, the press could have printed the story without revealing the source or could have simply attributed the source to "someone close to the Whitney campaign" without revealing Cohen's name.

I find the consequences of this decision deplorable. First, potential news sources will now be reluctant to give information to reporters. As a result, the public could very well be denied far more important information about candidates for public office relevant to evaluating their qualifications than the rather trivial infractions disclosed here. Second, it offends the fundamental principle of equality under the law.

This decision sends out a clear message that if you are wealthy and powerful enough, the law simply does not apply to you; contract law, it now seems, applies only to millions of ordinary people. It is unconscionable to allow the press, on the one hand, to hide behind the shield of confidentiality when it does not want to reveal the source of its information; yet, on the other hand, to violate confidentiality agreements with impunity when it decides that disclosing the source will help make its story more sensational and profitable. During the Watergate crisis, the press published many pious editorials urging that the laws be enforced equally against everyone, even the President of the United States. Nevertheless, the press now argues that the law should not apply to them because they alone are entitled to make "editorial decisions" as to what the public should read, see, or hear and whether the source of that information should be disclosed.

The decision in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), has not resulted in a more responsible press. In the 19th century, the phrases "scandal sheet" and "yellow journalism" became common adjectives for disreputable publications. It would be tragic if these colorful descriptions regained popular usage because of the practices of a few of the more sensational "journalistic" enterprises which appear to be growing in number and popularity, replacing the great newspapers of the past.

Perhaps it is time in these United States to return to treating the press the same as any other citizen. Let them print anything they choose to print, but make them legally responsible if they break their promises or act negligently in connection with what they print—free of any special protection carved out by *New York Times v. Sullivan* or any of its progeny. The decision of this court makes this a sad day in the history of a responsible press in America. Because I firmly believe that no one should be above the law, including the President of the United States or the news media, I would affirm the court of appeals.

KELLEY, Justice (dissenting).

A majority of this court recently held that a commercial media defendant, who the jury found had done a "hatchet job" with constitutional malice on a public official through distortion and/or omission of established facts and through unwarranted inference, was immune from tort liability, unlike the rest of the citizens of this state, corporate or private, who would undoubtedly be liable in tort for that type of conduct. I joined the dissent of Justice Yetka in that case. *Diesen v. Hessburg*, 455 N.W.2d 446 (Minn.1990) (Petition to withdraw pending). In my opinion, the majority today, applying a somewhat different analysis, affords to that same commercial media immunity from liability from an unmistakable breach of contract, although any other corporate or private citizen of this state under similar circumstances would most certainly have been liable in damages for breach of contract.

While I agree with the majority that the trial court erred in not granting the defendants' post-trial motions for judgment notwithstanding the verdict on the misrepresentation claim, I remain unpersuaded by the majority's analysis that, notwithstanding that all of the elements of a legal contract and its breach are here present, the contract is unenforceable because "the parties intended none." It reaches this conclusion even as it concedes that the promises given by the agents and employees of these defendants was intended by them to be kept. *Majority Op.* at ——.

Rather than affording Cohen a remedy for the considerable damage he sustained, see Art. I, § 8, Constitution of Minnesota, the majority, it seems to me, engaged in or came very close to engaging in some inappropriate appellate fact finding, to-wit, that each of the parties did not intend a contract and assumed the risk "of what might happen." I conclude that the analysis employed by Judge Short in the majority opinion of the court of appeals, *Cohen v. Cowles Media Co.*, 445 N.W.2d 248 (Minn. App.1989), correctly sets forth the applicable contract law governing the transaction between Cohen and employees and agents of these media defendants. Therefore, I adopt it as my dissent here. I likewise join the dissent of Justice Yetka which highlights the perfidy of these defendants, the liability for which they now seek to escape by trying to crawl under the aegis of the First Amendment, which, in my opinion, has nothing to do with the case.[1] Today's decision serves to inhibit rather than to promote the objectives of the First Amendment by "drying up" potential sources of information on public matters. I dissent.

1. These media defendants now advance a First Amendment argument based upon the "public's right to know." I suggest to do so is indeed ironical when considered in the light of the extensive efforts of each to promote enactment of Minnesota Statutes Sections 595.021 to 595.025, the Minnesota Free Flow of Information Act, sometimes popularly referred to as the Reporter's Shield Act. This statute protects the news media from compelled disclosure of sources in court and other proceedings. Ralph Bailey, editor of the Minneapolis Tribune, urged passage of a similar companion bill before the Judicial Administration Subcommittee of the Senate Judiciary Committee on March 30, 1973, as did an attorney-lobbyist for the St. Paul and Duluth newspapers. That same attorney-lobbyist and John Finnegan, Executive Editor, St. Paul Dispatch, appeared and testified at a meeting of the Judiciary Committee of the House of Representatives on March 1, 1973, and again later on March 14, 1973. Both participated in discussion of amendments to the proposed bill (House File 624), which ultimately was passed and is now codified as Minnesota Statutes Sections 595.021—595.025. Although minimal amendments to these statutes were made in 1981, 1983, and 1986, they did not change the basic substance of the statute. Thus, the Minnesota Free Flow of Information Act, when combined with today's decision, with few tightly circumscribed exceptions, leaves the "public's right to know and protection of confidential sources," not with the peoples' representatives—the legislature and the courts—but rather with the executives of the commercial media.