# COHEN *v.* COWLES MEDIA CO., DBA MINNEAPOLIS STAR & TRIBUNE CO., ET AL.

No. 90–634.   Argued March 27, 1991—Decided June 24, 1991

*Elliot C. Rothenberg* argued the cause and filed briefs for petitioner.

*John D. French* argued the cause for respondents. With him on the brief for respondent Cowles Media Co. were *John Borger* and *Randy M. Lebedoff.* *Stephen M. Shapiro, Andrew L. Frey, Kenneth S. Geller, Mark I. Levy, Michael W. McConnell, Paul R. Hannah, Laurie A. Zenner, John C.*

*Fontaine*, and *Cristina L. Mendoza* filed a brief for respondent Northwest Publications, Inc.*

JUSTICE WHITE delivered the opinion of the Court.

The question before us is whether the First Amendment prohibits a plaintiff from recovering damages, under state promissory estoppel law, for a newspaper's breach of a promise of confidentiality given to the plaintiff in exchange for information. We hold that it does not.

During the closing days of the 1982 Minnesota gubernatorial race, Dan Cohen, an active Republican associated with Wheelock Whitney's Independent-Republican gubernatorial campaign, approached reporters from the St. Paul Pioneer Press Dispatch (Pioneer Press) and the Minneapolis Star and Tribune (Star Tribune) and offered to provide documents relating to a candidate in the upcoming election. Cohen made clear to the reporters that he would provide the information only if he was given a promise of confidentiality. Reporters from both papers promised to keep Cohen's identity anonymous and Cohen turned over copies of two public court records concerning Marlene Johnson, the Democratic-Farmer-Labor candidate for Lieutenant Governor. The first record indicated that Johnson had been charged in 1969 with three counts of unlawful assembly, and the second that she had been convicted in 1970 of petit theft. Both newspapers interviewed Johnson for her explanation and one reporter tracked down the person who had found the records for Cohen. As it turned out, the unlawful assembly charges arose out of Johnson's participation in a protest of an alleged failure to hire minority workers on municipal construction projects, and the charges were eventually dismissed. The petit theft conviction was for leaving a store without paying

*Rex S. Heinke, Robert S. Warren, Jerry S. Birenz, Ralph P. Huber, W. Terry Maguire, Rene P. Milam, Richard M. Schmidt, Harold W. Fuson, Jr., Barbara Wartelle Wall, James E. Grossberg, George Freeman,* and *William A. Niese* filed a brief for Advance Publications, Inc., et al. as *amici curiae.*

for $6 worth of sewing materials. The incident apparently occurred at a time during which Johnson was emotionally distraught, and the conviction was later vacated.

After consultation and debate, the editorial staffs of the two newspapers independently decided to publish Cohen's name as part of their stories concerning Johnson. In their stories, both papers identified Cohen as the source of the court records, indicated his connection to the Whitney campaign, and included denials by Whitney campaign officials of any role in the matter. The same day the stories appeared, Cohen was fired by his employer.

Cohen sued respondents, the publishers of the Pioneer Press and Star Tribune, in Minnesota state court, alleging fraudulent misrepresentation and breach of contract. The trial court rejected respondents' argument that the First Amendment barred Cohen's lawsuit. A jury returned a verdict in Cohen's favor, awarding him $200,000 in compensatory damages and $500,000 in punitive damages. The Minnesota Court of Appeals, in a split decision, reversed the award of punitive damages after concluding that Cohen had failed to establish a fraud claim, the only claim which would support such an award. 445 N. W. 2d 248, 260 (1989). However, the court upheld the finding of liability for breach of contract and the $200,000 compensatory damages award. *Id.*, at 262.

A divided Minnesota Supreme Court reversed the compensatory damages award. 457 N. W. 2d 199 (1990). After affirming the Court of Appeals' determination that Cohen had not established a claim for fraudulent misrepresentation, the court considered his breach-of-contract claim and concluded that "a contract cause of action is inappropriate for these particular circumstances." *Id.*, at 203. The court then went on to address the question whether Cohen could establish a cause of action under Minnesota law on a promissory estoppel theory. Apparently, a promissory estoppel theory was never tried to the jury, nor briefed nor argued by

the parties; it first arose during oral argument in the Minnesota Supreme Court when one of the justices asked a question about equitable estoppel. See App. 38.

In addressing the promissory estoppel question, the court decided that the most problematic element in establishing such a cause of action here was whether injustice could be avoided only by enforcing the promise of confidentiality made to Cohen. The court stated: "Under a promissory estoppel analysis there can be no neutrality towards the First Amendment. In deciding whether it would be unjust not to enforce the promise, the court must necessarily weigh the same considerations that are weighed for whether the First Amendment has been violated. The court must balance the constitutional rights of a free press against the common law interest in protecting a promise of anonymity." 457 N. W. 2d, at 205. After a brief discussion, the court concluded that "in this case enforcement of the promise of confidentiality under a promissory estoppel theory would violate defendants' First Amendment rights." *Ibid.*

We granted certiorari to consider the First Amendment implications of this case. 498 U. S. 1011 (1990).

Respondents initially contend that the Court should dismiss this case without reaching the merits because the promissory estoppel theory was not argued or presented in the courts below and because the Minnesota Supreme Court's decision rests entirely on the interpretation of state law. These contentions do not merit extended discussion. It is irrelevant to this Court's jurisdiction whether a party raised below and argued a federal-law issue that the state supreme court actually considered and decided. *Orr* v. *Orr*, 440 U. S. 268, 274–275 (1979); *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 754, n. 2 (1985); *Mills* v. *Maryland*, 486 U. S. 367, 371, n. 3 (1988); *Franks* v. *Delaware*, 438 U. S. 154, 161–162 (1978); *Jenkins* v. *Georgia*, 418 U. S. 153, 157 (1974). Moreover, that the Minnesota Supreme Court rested its holding on federal law could not be made

more clear than by its conclusion that "in this case enforcement of the promise of confidentiality under a promissory estoppel theory would violate defendants' First Amendment rights." 457 N. W. 2d, at 205. It can hardly be said that there is no First Amendment issue present in the case when respondents have defended against this suit all along by arguing that the First Amendment barred the enforcement of the reporters' promises to Cohen. We proceed to consider whether that Amendment bars a promissory estoppel cause of action against respondents.

The initial question we face is whether a private cause of action for promissory estoppel involves "state action" within the meaning of the Fourteenth Amendment such that the protections of the First Amendment are triggered. For if it does not, then the First Amendment has no bearing on this case. The rationale of our decision in *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), and subsequent cases compels the conclusion that there is state action here. Our cases teach that the application of state rules of law in state courts in a manner alleged to restrict First Amendment freedoms constitutes "state action" under the Fourteenth Amendment. See, *e. g.*, *id.*, at 265; *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 916, n. 51 (1982); *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767, 777 (1986). In this case, the Minnesota Supreme Court held that if Cohen could recover at all it would be on the theory of promissory estoppel, a state-law doctrine which, in the absence of a contract, creates obligations never explicitly assumed by the parties. These legal obligations would be enforced through the official power of the Minnesota courts. Under our cases, that is enough to constitute "state action" for purposes of the Fourteenth Amendment.

Respondents rely on the proposition that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a

state interest of the highest order." *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97, 103 (1979). That proposition is unexceptionable, and it has been applied in various cases that have found insufficient the asserted state interests in preventing publication of truthful, lawfully obtained information. See, *e. g.*, *Florida Star* v. *B. J. F.*, 491 U. S. 524 (1989); *Smith* v. *Daily Mail, supra; Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829 (1978).

This case, however, is not controlled by this line of cases but, rather, by the equally well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news. As the cases relied on by respondents recognize, the truthful information sought to be published must have been lawfully acquired. The press may not with impunity break and enter an office or dwelling to gather news. Neither does the First Amendment relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source. *Branzburg* v. *Hayes*, 408 U. S. 665 (1972). The press, like others interested in publishing, may not publish copyrighted material without obeying the copyright laws. See *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 576–579 (1977). Similarly, the media must obey the National Labor Relations Act, *Associated Press* v. *NLRB*, 301 U. S. 103 (1937), and the Fair Labor Standards Act, *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 192–193 (1946); may not restrain trade in violation of the antitrust laws, *Associated Press* v. *United States*, 326 U. S. 1 (1945); *Citizen Publishing Co.* v. *United States*, 394 U. S. 131, 139 (1969); and must pay nondiscriminatory taxes, *Murdock* v. *Pennsylvania*, 319 U. S. 105, 112 (1943); *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 581–583 (1983).

Cf. *University of Pennsylvania* v. *EEOC*, 493 U. S. 182, 201–202 (1990). It is, therefore, beyond dispute that "[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." *Associated Press* v. *NLRB, supra*, at 132–133. Accordingly, enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations.

There can be little doubt that the Minnesota doctrine of promissory estoppel is a law of general applicability. It does not target or single out the press. Rather, insofar as we are advised, the doctrine is generally applicable to the daily transactions of all the citizens of Minnesota. The First Amendment does not forbid its application to the press.

JUSTICE BLACKMUN suggests that applying Minnesota promissory estoppel doctrine in this case will "punish" respondents for publishing truthful information that was lawfully obtained. *Post*, at 675–676. This is not strictly accurate because compensatory damages are not a form of punishment, as were the criminal sanctions at issue in *Smith* v. *Daily Mail, supra*. If the contract between the parties in this case had contained a liquidated damages provision, it would be perfectly clear that the payment to petitioner would represent a cost of acquiring newsworthy material to be published at a profit, rather than a punishment imposed by the State. The payment of compensatory damages in this case is constitutionally indistinguishable from a generous bonus paid to a confidential news source. In any event, as indicated above, the characterization of the payment makes no difference for First Amendment purposes when the law being applied is a general law and does not single out the press. Moreover, JUSTICE BLACKMUN's reliance on cases like *Florida Star* v. *B. J. F., supra*, and *Smith* v. *Daily Mail* is misplaced. In those cases, the State itself defined the content of publications that would trigger liability. Here, by con-

trast, Minnesota law simply requires those making promises to keep them. The parties themselves, as in this case, determine the scope of their legal obligations, and any restrictions that may be placed on the publication of truthful information are self-imposed.

Also, it is not at all clear that respondents obtained Cohen's name "lawfully" in this case, at least for purposes of publishing it. Unlike the situation in *Florida Star*, where the rape victim's name was obtained through lawful access to a police report, respondents obtained Cohen's name only by making a promise that they did not honor. The dissenting opinions suggest that the press should not be subject to any law, including copyright law for example, which in any fashion or to any degree limits or restricts the press' right to report truthful information. The First Amendment does not grant the press such limitless protection.

Nor is Cohen attempting to use a promissory estoppel cause of action to avoid the strict requirements for establishing a libel or defamation claim. As the Minnesota Supreme Court observed here, "Cohen could not sue for defamation because the information disclosed [his name] was true." 457 N. W. 2d, at 202. Cohen is not seeking damages for injury to his reputation or his state of mind. He sought damages in excess of $50,000 for breach of a promise that caused him to lose his job and lowered his earning capacity. Thus, this is not a case like *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46 (1988), where we held that the constitutional libel standards apply to a claim alleging that the publication of a parody was a state-law tort of intentional infliction of emotional distress.

Respondents and *amici* argue that permitting Cohen to maintain a cause of action for promissory estoppel will inhibit truthful reporting because news organizations will have legal incentives not to disclose a confidential source's identity even when that person's identity is itself newsworthy. JUSTICE SOUTER makes a similar argument. But if this is the case,

it is no more than the incidental, and constitutionally insignificant, consequence of applying to the press a generally applicable law that requires those who make certain kinds of promises to keep them. Although we conclude that the First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law, we reject Cohen's request that in reversing the Minnesota Supreme Court's judgment we reinstate the jury verdict awarding him $200,000 in compensatory damages. See Brief for Petitioner 31. The Minnesota Supreme Court's incorrect conclusion that the First Amendment barred Cohen's claim may well have truncated its consideration of whether a promissory estoppel claim had otherwise been established under Minnesota law and whether Cohen's jury verdict could be upheld on a promissory estoppel basis. Or perhaps the State Constitution may be construed to shield the press from a promissory estoppel cause of action such as this one. These are matters for the Minnesota Supreme Court to address and resolve in the first instance on remand. Accordingly, the judgment of the Minnesota Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL and JUSTICE SOUTER join, dissenting.

I agree with the Court that the decision of the Supreme Court of Minnesota rested on federal grounds and that the judicial enforcement of petitioner's promissory estoppel claim constitutes state action under the Fourteenth Amendment. I do not agree, however, that the use of that claim to penalize the reporting of truthful information regarding a political campaign does not violate the First Amendment. Accordingly, I dissent.

The majority concludes that this case is not controlled by the decision in *Smith* v. *Daily Mail Publishing Co.*, 443

U. S. 97 (1979), to the effect that a State may not punish the publication of lawfully obtained, truthful information "absent a need to further a state interest of the highest order." *Id.*, at 103. Instead, we are told, the controlling precedent is "the equally well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Ante*, at 669. See, *e. g.*, *Branzburg* v. *Hayes*, 408 U. S. 665 (1972); *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 192–193 (1946); *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 581–583 (1983). I disagree.

I do not read the decision of the Supreme Court of Minnesota to create any exception to, or immunity from, the laws of that State for members of the press. In my view, the court's decision is premised, not on the identity of the speaker, but on the speech itself. Thus, the court found it to be of "critical significance," that "the promise of anonymity arises in the classic First Amendment context of the quintessential public debate in our democratic society, namely, a political source involved in a political campaign." 457 N. W. 2d 199, 205 (1990); see also *id.*, at 204, n. 6 (*"New York Times* v. *Sullivan*, 376 U. S. 254 . . . (1964), holds that a state may not adopt a state rule of law to impose impermissible restrictions on the federal constitutional freedoms of speech and press"). Necessarily, the First Amendment protection afforded respondents would be equally available to nonmedia defendants. See, *e. g.*, *Lovell* v. *Griffin*, 303 U. S. 444, 452 (1938) ("The liberty of the press is not confined to newspapers and periodicals. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion"). The majority's admonition that "'[t]he publisher of a newspaper has no special immunity from the application of general laws,'" *ante*, at 670, and its

reliance on the cases that support that principle, are therefore misplaced.

In *Branzburg*, for example, this Court found it significant that "these cases involve no intrusions upon speech or assembly, no . . . restriction on what the press may publish, and no express or implied command that the press publish what it prefers to withhold. . . . [N]o penalty, civil or criminal, related to the content of published material is at issue here." 408 U. S., at 681. Indeed, "[t]he sole issue before us" in *Branzburg* was "the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime." *Id.*, at 682. See also *Associated Press* v. *NLRB*, 301 U. S. 103, 133 (1937); *Associated Press* v. *United States*, 326 U. S. 1, 20, n. 18 (1945); *Citizen Publishing Co.* v. *United States*, 394 U. S. 131, 139 (1969). In short, these cases did *not* involve the imposition of liability based upon the content of speech.[1]

Contrary to the majority, I regard our decision in *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46 (1988), to be precisely on point. There, we found that the use of a claim of intentional infliction of emotional distress to impose liability for the publication of a satirical critique violated the First

---

[1] The only arguable exception is *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562 (1977). In *Zacchini*, a performer sued a news organization for appropriation of his "right to the publicity value of his performance," *id.*, at 565, after it broadcast the entirety of his act on local television. This Court held that the First Amendment did not bar the suit. We made clear, however, that our holding did not extend to the reporting of *information* about an event of public interest. We explained: "If . . . respondent had merely reported that petitioner was performing at the fair and described or commented on his act, with or without showing his picture on television, we would have a very different case." *Id.*, at 569. Thus, *Zacchini* cannot support the majority's conclusion that "a law of general applicability," *ante*, at 670, may not violate the First Amendment when employed to penalize the dissemination of truthful information or the expression of opinion.

Amendment. There was no doubt that Virginia's tort of intentional infliction of emotional distress was "a law of general applicability" unrelated to the suppression of speech.[2] Nonetheless, a unanimous Court found that, when used to penalize the expression of opinion, the law was subject to the strictures of the First Amendment. In applying that principle, we concluded, *id.*, at 56, that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,'" as defined by *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964). In so doing, we rejected the argument that Virginia's interest in protecting its citizens from emotional distress was sufficient to remove from First Amendment protection a "patently offensive" expression of opinion. 485 U. S., at 50.[3]

As in *Hustler*, the operation of Minnesota's doctrine of promissory estoppel in this case cannot be said to have a merely "incidental" burden on speech; the publication of important political speech *is* the claimed violation. Thus, as in *Hustler*, the law may not be enforced to punish the expres-

---

[2] The Virginia cause of action for intentional infliction of emotional distress at issue in *Hustler* provided for recovery where a plaintiff could demonstrate "that the defendant's conduct (1) is intentional or reckless; (2) offends generally accepted standards of decency or morality; (3) is causally connected with the plaintiff's emotional distress; and (4) caused emotional distress that was severe." 485 U. S., at 50, n. 3.

[3] The majority attempts to distinguish *Hustler* on the ground that there the plaintiff sought damages for injury to his state of mind whereas the petitioner here sought damages "for a breach of a promise that caused him to lose his job and lowered his earning capacity." *Ante*, at 671. I perceive no meaningful distinction between a statute that penalizes published speech in order to protect the individual's psychological well being or reputational interest and one that exacts the same penalty in order to compensate the loss of employment or earning potential. Certainly, our decision in *Hustler* recognized no such distinction.

sion of truthful information or opinion.[4]    In the instant case, it is undisputed that the publication at issue was true.

To the extent that truthful speech may ever be sanctioned consistent with the First Amendment, it must be in further- ance of a state interest "of the highest order."  *Smith*, 443 U. S., at 103.    Because the Minnesota Supreme Court's opinion makes clear that the State's interest in enforcing its promissory estoppel doctrine in this case was far from com- pelling, see 457 N. W. 2d, at 204–205, I would affirm that court's decision.

I respectfully dissent.

JUSTICE SOUTER, with whom JUSTICE MARSHALL, JUS- TICE BLACKMUN, and JUSTICE O'CONNOR join, dissenting.

I agree with JUSTICE BLACKMUN that this case does not fall within the line of authority holding the press to laws of general applicability where commercial activities and rela-

---

[4] The majority argues that, unlike the criminal sanctions we considered in *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97 (1979), the liability at issue here will not "punish" respondents in the strict sense of that word. *Ante*, at 670.    While this may be true, we have long held that the imposi- tion of civil liability based on protected expression constitutes "punish- ment" of speech for First Amendment purposes.    See, *e. g.*, *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376, 386 (1973) ("In the context of a libelous advertisement . . . this Court has held that the First Amendment does not shield a newspaper from *punishment* for libel when with actual malice it publishes a falsely defamatory ad- vertisement") (emphasis added), citing *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279–280 (1964); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974) ("*[P]unishment* of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press") (emphasis added).    Cf. *New York Times Co.*, 376 U. S., at 297 (Black, J., concurring) ("To *punish* the exercise of this right to discuss pub- lic affairs or to *penalize* it through libel judgments is to abridge or shut off discussion of the very kind most needed") (emphasis added).

Though they be civil, the sanctions we review in this case are no more justifiable as "a cost of acquiring newsworthy material," *ante*, at 670, than were the libel damages at issue in *New York Times Co.*, a permissible cost of disseminating newsworthy material.

tionships, not the content of publication, are at issue. See *ante*, at 674. Even such general laws as do entail effects on the content of speech, like the one in question, may of course be found constitutional, but only, as Justice Harlan observed,

> "when [such effects] have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved. . . . Whenever, in such a context, these constitutional protections are asserted against the exercise of valid governmental powers a reconciliation must be effected, and that perforce requires an appropriate weighing of the respective interests involved." *Konigsberg* v. *State Bar of California*, 366 U. S. 36, 51 (1961).

Thus, "[t]here is nothing talismanic about neutral laws of general applicability," *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 901 (1990) (O'CONNOR, J., concurring in judgment), for such laws may restrict First Amendment rights just as effectively as those directed specifically at speech itself. Because I do not believe the fact of general applicability to be dispositive, I find it necessary to articulate, measure, and compare the competing interests involved in any given case to determine the legitimacy of burdening constitutional interests, and such has been the Court's recent practice in publication cases. See *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46 (1988); *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562 (1977).

Nor can I accept the majority's position that we may dispense with balancing because the burden on publication is in a sense "self-imposed" by the newspaper's voluntary promise of confidentiality. See *ante*, at 671. This suggests both the possibility of waiver, the requirements for which have not been met here, see, *e. g., Curtis Publishing Co.* v. *Butts*, 388 U. S. 130, 145 (1967), as well as a conception of First Amendment rights as those of the speaker alone, with a value that may be measured without reference to the importance of the

information to public discourse. But freedom of the press is ultimately founded on the value of enhancing such discourse for the sake of a citizenry better informed and thus more prudently self-governed. "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 783 (1978). In this context, "'[i]t is the right of the [public], not the right of the [media], which is paramount,'" *CBS, Inc.* v. *FCC*, 453 U. S. 367, 395 (1981) (emphasis omitted) (quoting *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 390 (1969)), for "[w]ithout the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally," *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 492 (1975); cf. *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555, 573 (1980); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 278–279 (1964).

The importance of this public interest is integral to the balance that should be struck in this case. There can be no doubt that the fact of Cohen's identity expanded the universe of information relevant to the choice faced by Minnesota voters in that State's 1982 gubernatorial election, the publication of which was thus of the sort quintessentially subject to strict First Amendment protection. See, *e. g., Eu* v. *San Francisco Cty. Democratic Central Comm.*, 489 U. S. 214, 223 (1989). The propriety of his leak to respondents could be taken to reflect on his character, which in turn could be taken to reflect on the character of the candidate who had retained him as an adviser. An election could turn on just such a factor; if it should, I am ready to assume that it would be to the greater public good, at least over the long run.

This is not to say that the breach of such a promise of confidentiality could never give rise to liability. One can conceive of situations in which the injured party is a private indi-

vidual, whose identity is of less public concern than that of petitioner; liability there might not be constitutionally prohibited. Nor do I mean to imply that the circumstances of acquisition are irrelevant to the balance, see, *e. g.*, *Florida Star* v. *B. J. F.*, 491 U. S. 524, 534–535, and n. 8 (1989), although they may go only to what balances against, and not to diminish, the First Amendment value of any particular piece of information.

Because I believe the State's interest in enforcing a newspaper's promise of confidentiality insufficient to outweigh the interest in unfettered publication of the information revealed in this case, I respectfully dissent.