MANAGEMENT INFORMATION TECHNOLOGIES, INC., et al., Plaintiffs

v.

ALYESKA PIPELINE SERVICE COMPANY, et al., Defendants.

Civ. A. No. 92–1730.

United States District Court, District of Columbia.

Oct. 8, 1993.

Opinion on Motion for Reconsideration Oct. 20, 1993.

See also, 151 F.R.D. 478.

John Michael Clifford, Richard Taylor Rossier, Mona Lyons, Christine Marie Cooper, McLeod, Walkinson & Miller, Washington, DC, for plaintiffs.

Robert Elijah Jordan, III, Steptoe & Johnson, Washington, DC, for Alyeska Pipeline Service Co., Inc., ARCO Transp. Corp., and BP Pipeline Corp.

Robert Kenly Webster, Thomas W. Mitchell, Shaw, Pittman, Potts & Trowbridge, Washington, DC, for James Patrick Wellington.

Gerard F. Treanor, Cacheris & Treanor, Amy Berman Jackson, Douglas D. Connah, Jr., Venable, Baetjer, Howard & Civiletti, Washington, DC, for the Wackenhut Corp.

Richard Craig Warmer, O'Melveny & Myers, Washington, DC, for Exxon Pipeline Corp. and Exxon Corp.

Gerard F. Treanor, Cacheris & Treanor, Jonathan S. Feld, John Whitelaw Nields, Jr., Howrey & Simon, Washington, DC, for Wayne B. Black.

Larry Stuart Gondelman, Clinton Ray Batterton, Akin, Gump, Strauss, Hauer & Feld, Gerard F. Treanor, Cacheris & Treanor, Washington, DC, for Richard Lund.

Jerald Shropshire Howe, Jr., Morgan Day Hodgson, Christian R. Bartholomew, William Lewis Martin, II, Steptoe & Johnson, Washington, DC, for Alyeska Pipeline Service Co., ARCO Transp., Inc. and BP Pipelines, Inc.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

Now before the Court is non-party movant Patti Epler's motion for a protective order. For the reasons stated in the following memorandum opinion, the requested protective order will be entered.

### 1. General Background

This case involves a suit by Charles and Kathleen Hamel against the Alyeska Pipeline Corporation, its owner companies, the Wackenhut Corporation, a private security/investigation firm, as well as individual named defendants. Plaintiffs, Charles Hamel, Kathleen Hamel and Management Information Technologies, Inc. ("MITI"), brought this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., the Fair Credit Reporting Act, 15 U.S.C. § 1681, and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, et seq. (as amended by the Electronic Communications Privacy Act of 1986).[1] Plaintiffs also have requested relief under a number of pendant state law claims, including fraudulent misrepresentation, invasion of privacy, trespass, intentional infliction of emotional distress and negligence.

Defendant Alyeska Pipeline Service Company operates the Trans–Alaska Pipeline System ("TAPS") on behalf of the owners of TAPS. Approximately 90% of the ownership interest in TAPS is held by Defendants BP Pipeline, ARCO Pipeline Company, and Exxon Pipeline Company (hereinafter collectively referred to as "Owners").

Defendant Wackenhut Corporation is an international security firm, organized under the laws of the State of Florida, which provides security for the Trans–Alaska Pipeline through its wholly-owned subsidiary American Guard and Alert. Wackenhut also provides security services in Washington, D.C. Defendants Wayne B. Black and Richard Lund are Florida residents and employees of Wackenhut. Defendant James Patrick Wellington is a resident of Anchorage, Alaska and the Director of Security at Alyeska.

Charles Hamel, presently a resident of Virginia, had been an independent oil and shipping broker. He alleges that he lost his business when the oil delivered by Alyeska to his tankers was found to be significantly diluted with water. His unsuccessful attempts to work out this problem with some of the defendants in this case resulted in his reporting environmental wrongdoing on the part of Alyeska to the U.S. Environmental Protection Agency ("EPA"), Congress and Alaska's Department of Environmental Conservation. Mr. Hamel's allegations in this regard have been part of a Congressional investigation.

Plaintiffs allege that, as a result of Mr. Hamel's reporting Alyeska's environmental abuses, Alyeska and the Owners embarked on a scheme "to obtain information and documents in the Hamels' possession and to prevent, through intimidation, Charles Hamel and his sources from reporting serious environmental wrongdoing by Alyeska" to the pertinent government entities. First Amended Complaint at ¶ 3. Plaintiff MITI became involved in the case as a result of its association with Mr. Hamel, who was a member of the Board of MITI and frequently used its mailing address to receive informa-

---

**1.** The claims alleged by the plaintiffs under these acts will be referred to as the RICO, FCRA and Title III claims, respectively.

tion from his sources within Alyeska. Wackenhut was engaged to execute the plan.

Plaintiffs allege that, in implementing the plan, the Defendants created a "dummy" environmental organization called "The Ecolit Group", which they used to gain the Hamels' confidence and cooperation; taped the Hamels' personal phone calls, meetings and other private conversations; took documents from the Hamels' home without authorization; illegally searched the Hamels' trash; stole unopened mail; and illegally obtained the Hamels' phone records and the Hamels' private credit information.

One defense theory posited by Defendants is that they were justified in investigating the Hamels because Alyeska reasonably believed that the Hamels possessed stolen company property:

> [A]n investigation was undertaken for the specific purpose of inquiring into the circumstances surrounding the wrongful and unlawful taking of documents protected by the attorney-client privileged [sic] and other documents and information in which Alyeska had a protected property right and to determine the circumstances involving the wrongful and unlawful taking and appropriation of other documents and information in which Alyeska had a protected property right.

*Joint Answer of Defendants Alyeska Pipeline Service and J. Patrick Wellington to First Amended Complaint and Counterclaims of Alyeska Pipeline Service Company*, ¶ 3 at 2. Alyeska defends other actions taken with regard to Hamel as "a perfectly predictable and lawful reaction of a company responding to public accusations of a frequent and vocal critic of the company." *Id.*, ¶ 32 at 12. In brief, Alyeska asserts that because of the invasive conduct engaged in by Mr. Hamel, he deprived himself of any reasonable expectation of privacy. *Id.*, Sixth Affirmative Defense, ¶ 3 at 81.

### 2. Background to Motion for Protective Order

Patti Epler is a reporter for the Tacoma News Tribune in Tacoma, Washington. Between 1984 and 1990, Ms. Epler was a newspaper reporter for the Anchorage Daily News, covering the oil and gas beat. During that time Ms. Epler did significant investigative reporting on environmental and safety issues related to the Trans–Alaska Pipeline. These news stories included a profile of Charles Hamel and his battle with the oil industry. *Affidavit of Richard Mauer*, Sept. 15, 1993 at ¶ 4. In a deposition, Mr. Hamel has testified that he received from Ms. Epler a manila envelope containing a collection of documents relating to Alyeska, some of which were marked "attorney-client privileged". *Deposition of Charles Hamel*, Aug. 31, 1993, Vol. 1 at 119.

On September 1, 1993, Ms. Epler was served with a subpoena by Alyeska, commanding her to appear on September 7 in Seattle to produce documents, and again on September 13 in Seattle to give testimony in this case. Alyeska "seek[s] to depose Ms. Epler primarily to determine what confidential Alyeska documents and information she gave to Mr. Hamel." *Memorandum in Opposition to Motion to Quash Subpoena*, at 2. Ms. Epler has declined to provide either documents [2] or testimony, asserting her common law, state law, and First Amendment privilege as a journalist.

The gist of Ms. Epler's motion is that the freedom guaranteed to newspapers under the First Amendment of the Constitution will be significantly undercut if she, as a non-party news reporter in possession of only tangentially relevant information, is forced to testify in a dispute involving a company she covered as a reporter:

> A reporter must be free to seek out, confirm, corroborate, and test the accuracy or significance of documents and information by a variety of means without worrying that this process of gathering news will be subjected to forced discovery and scrutiny down the road. As a journalist, and particularly with respect to covering this important business [of the oil and gas industry in Alaska], I believe that there would

---

**2.** Ms. Epler in her affidavit states categorically that she has no documents responsive to the subpoena.

be a significant chilling effect on my reporting activities if I, and the people I deal with, knew that the companies I was reporting on—or, for that matter critics of those companies, regulators, or anyone else claiming some special interest—could require me to answer to them under oath as to what documents I have received or reviewed, with whom I have consulted on matters relating to my news reporting, my reasons for doing so in any particular case, my means or methods of conducting my business, explanations of how I exercise my professional judgment in a given situation, my assessments of information or sources of information provided to me or any other steps in the editorial and news gathering process.

*Affidavit of Patti S. Epler,* Sept. 15, 1993, at ¶ 6.

Defendant Alyeska posits three reasons why the reporter's privilege cannot apply in this case. First, Alyeska asserts that the privilege cannot apply because Epler engaged with Hamel and others in the tortious conversion of proprietary Alyeska documents. Epler, says Alyeska, cannot be protected by the First Amendment against questioning regarding this illegal activity. Second, Alyeska insists that the document delivery from Epler to Hamel was not done in the context of newsgathering or in a reporting capacity. Thus, no privilege can apply. And finally, even if the privilege is found to have some application to Ms. Epler and her relationship with Mr. Hamel, because Ms. Epler is the only avenue by which Alyeska can discover the requested information—information that is crucial to Alyeska's defense—the privilege must yield.

### 3. *Analysis*

#### a. *Criminal Conversion*

■ Alyeska's argument that no privilege can apply because Ms. Epler engaged in tortious or otherwise criminal conversion of the disputed Alyeska documents is without merit. There is no evidence that the documents in question are originals or that Alyeska does not have access to copies of the disputed documents. There is no evidence that Alyeska has been deprived of the use of

the documents. All that is alleged is that privileged documents were without authorization taken from Alyeska and copies ended up in the hands of Mr. Hamel and that Ms. Epler may have been Hamel's source. *Memorandum in Opposition* at 7.

■ It is axiomatic that the First Amendment does not give newspaper reporters a blanket right to break the law in the pursuit of news. *See e.g., Branzburg v. Hayes,* 408 U.S. 665, 683, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972) (reporter has "no special immunity from the application of the general law"); *Cohen v. Cowles Media Co.,* — U.S. —, —, 111 S.Ct. 2513, 2518, 115 L.Ed.2d 586 (1991) ("The press may not with impunity break and enter an office or dwelling to gather news. . . ."). But at the same time, the possession of copies of proprietary documents by a news reporter does not lead inescapably to the conclusion that the journalist has committed a tort.

In *FMC Corp. v. Capital Cities/ABC, Inc.,* the 7th Circuit made clear that "possession of copies of documents—as opposed to the documents themselves—does not amount to an interference with the owner's property sufficient to constitute conversion." 915 F.2d 300, 303 (7th Cir.1990). In that case, the Court found that where ABC News was in possession of original FMC documents which could not be located in FMC files, ABC was required to return at least copies of the documents. The case does not support Alyeska's argument that conversion can be found to exist absent evidence that the news organization has deprived the document's owner of use of the document.

#### b. *Conduct was not newsgathering*

■ The assertion that Ms. Epler's contact with Mr. Hamel was not in the context of newsgathering is also without merit. It is fundamental to a reporter's work that she be able to meet and make contact with as many potential sources as possible. Once having established a contact person with particularized knowledge, it is normal for a reporter to interact with that contact person by showing related documents and asking for comment, or simply by providing information about a

subject thought to be of mutual interest. To say that the mutual exchange of information is not in furtherance of the constitutionally protected activity is to turn a blind eye to what it is investigative journalists do:

> The fact is, sharing documents with experts, sources and even other journalists is a standard investigative technique of investigative journalism. Often, that is the only way a reporter can test whether the material is genuine or find out what it really means.

> For example, sources outside the newspaper may have access to different documents than those we have received. Maybe none of the material makes much sense alone, but taken together the pieces can form an important, newsworthy whole.

> It's the nature of confidential material to be confusing and often obscure. Rarely does a reporter come across a "smoking gun" memo where misdeeds are confessed in clear, uncluttered English for all the world to see.

> More often, the tipster provides us an inside document that means almost nothing to the average reader (or reporter)— but which can be crucial when interpreted in context and explained....

> And so good reporters often need to share information with others before they even know whether it is important or meaningful. It's an essential part of our effort to be careful and comprehensive. In those cases, the mistake would be in failing to test the information—not in sharing it to help check it out.

Howard Weaver, *Investigative reporter uses all resources*, Anchorage Daily News, Nov. 3, 1991.[3]

■ Alyeska provides no reason for the Court to conclude that Ms. Epler's contact with Charles Hamel was for any purpose other than newsgathering. Alyeska simply asserts:

> "Mr. Hamel's testimony contains nothing to indicate that Ms. Epler was providing the privileged documents in connection with her newsgathering or reporting functions, nor do movant's papers make any showing on this point."

*Memorandum in Opposition* at 14. The evidence is to the contrary. Affidavits by Ms. Epler and other newspaper employees make clear that Ms. Epler was an award-winning journalist who had spent the better part of six-years covering the oil and gas industry in Alaska and specifically the Trans–Alaska Pipeline. Charles Hamel was the subject of one of her articles and a source for others. The documents in question were undeniably relevant to Ms. Epler's work. Giving a copy of these documents to a source familiar with Alyeska must be deemed part of the newsgathering function.[4] It is up to Alyeska to show that the Epler–Hamel relationship existed for some reason other than newsgathering. Until such a showing is made, this Court must find that Ms. Epler's passing of documents to Hamel or discussion of documents with him was part of her work as a journalist and is therefore covered by the reporter's privilege.

### c. *Privilege must yield*

Alyeska's final argument, and its most persuasive, is that even if covered under the reporter's privilege the privilege must yield because the Ms. Epler has information that cannot be obtained by any other means and which is critical for Alyeska's defense.

■ Alyeska is correct that the reporter's privilege is not absolute. The Supreme Court has made it clear that in criminal cases the reporter's privilege must be weighed against other important societal interests:

---

**3.** The Court recognizes that this editorial appeared in movant's newspaper after public revelations that she might have shared information with Charles Hamel. Nevertheless, the editorial was written before the current lawsuit, not in anticipation of any subpoena, and is a convincing explication of how investigative journalism works.

**4.** In cases such as this, it is clearly the appropriate initial course for a court to examine and give weight to the affidavit(s) of the reporter. For a court to go further, the opposing party must in some way put in dispute the facts set forth in the affidavit. In this case, Alyeska has made no showing that would place in issue the truth of the material statements contained in Ms. Epler's affidavit(s).

The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Branzburg v. Hayes,* 408 U.S. 665, 710, 92 S.Ct. 2646, 2671, 33 L.Ed.2d 626 (1972). But this is not a criminal case. The D.C. Circuit has made clear that in a civil case the reporter's privilege is to be entitled to great weight. Indeed, in a civil case "if the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished." *Zerilli v. Smith,* 656 F.2d 705, 712 (D.C.Cir.1981).

The key criteria for whether disclosure is appropriate is whether the information sought goes to the "heart of the matter". *Zerilli,* at 713. "[I]f the information sought is only marginally relevant, disclosure may be very difficult to justify." *Id.* A leading indicator for the importance of the reporter's information to the case is whether the reporter is a party. *Id.* at 714.

Applying the criteria laid down in *Zerilli,* the Court finds no justification for requiring Ms. Epler to provide the requested documents or to testify in a deposition. She is not a party. The information requested is of only marginal value considering the issues and the substantial amount of discovery that has already gone on in this case.

It has not yet been made clear to this Court how the information, no matter what it showed, would be more than borderline probative of the defenses asserted by Alyeska. Alyeska points to the fact that Hamel alleges Alyeska officials "knew that Hamel had received a copy of the attorney-client privileged documents from a newspaper reporter and not from Alyeska employees". *Memorandum in Opposition* at 9 (citing First Amended Complaint at ¶ 177). This is one of the pieces of evidence that Hamel hopes to use to show that Alyeska's investigation was unjustified. It is not evident to the Court that deposing Epler will help to disprove an alle-gation that goes to Alyeska's state of mind. The assertion that Alyeska knew or did not know about the transmittal of information from Epler to Hamel rises or falls, not based on what actually occurred, but based on what Alyeska *thought* was occurring at the time they launched their investigation. If relevant, any information gleaned from a deposition would be only marginally probative.

In addition, this Court believes it would set an unfortunate precedent if a reporter or a newspaper were subject to discovery whenever a source becomes legally entangled with the object of the newspaper's attention. Such a ruling would stand the first amendment on its head. The Trans–Alaska Pipeline is part of an energy life-line that sustains this nation. The management and safety of the pipeline is rightfully a matter of intense public interest. Reporters cannot be dragged into civil litigation every time a case presents an issue that would provoke a newspaper story. The prejudice to the defendants that will result if Ms. Epler is not deposed in this case would be at best inconsequential.

Therefore, the protective order sought by Ms. Epler will be entered.

*MEMORANDUM OPINION AND ORDER ON MOTION FOR RECONSIDERATION*

Before the Court is Defendant's Motion for Reconsideration of Protective Order Regarding Patti Epler, or in the alternative Certification of an Interlocutory Appeal. The motion for reconsideration will be denied. The motion for certification of an interlocutory appeal also will be denied.

Patti Epler is a non-party newspaper reporter whose contact with Plaintiff Charles Hamel has been through her coverage of the Trans–Alaska Pipeline and the oil and gas industry in Alaska. Defendants wish to question Ms. Epler regarding her contacts with Mr. Hamel. Specifically, defendants wish to ask Ms. Epler about certain alleged attorney-client privileged Alyeska documents. Defendants argue Ms. Epler possesses information crucial to their defense and to their counterclaim. The counterclaim

alleges that Hamel has received stolen Alyeska documents. Defendants ask for a return of all stolen documents and an injunction to prevent future thefts. The Court finds these arguments unpersuasive.

Discovery in this case has gone far beyond anything imaginable. For a number of months now, the parties have had multiple teams of lawyers criss-crossing the country for depositions and other discovery matters. The Court has felt obliged to grant extensions on discovery matters because counsel have been exhausted and requested additional time to recover before gearing up for the next discovery battle. The case is now scheduled for trial on November 15 and discovery must come to an end.

■ In particular, this Court will not permit the defendants to depose a newspaper reporter to examine that reporter's files or probe her mind with questions about the manner in which she conducts her business. The adverse impact on the First Amendment and chilling effect that would result from permitting a non-party news reporter to be dragged into a civil dispute would be substantial. It would be an unwarranted assault on the reporter's rights and the First Amendment.

The argument that this information is crucial for defendants' counterclaim is a makeweight. The Court is confident that it will have adequate information from which to craft any injunction that may be necessitated by defendants' counterclaim. The Court has the ability to deal with improper actions by any of the parties in this case.

A simple balance of the marginal benefit of the information sought against the gargantuan amount of discovery that has already taken place in this case would, as a preliminary matter, suggest that this motion should be denied. Taking into account the needs of the case and the importance of the issues at stake in the litigation, the Court finds that the discovery process has become unduly burdensome. The additional consideration of fundamental First Amendment rights makes the decision compelling. The need for the information is clearly outweighed by the rights to be protected. Of course, if during the course of the trial it becomes apparent that this information is essential, the Court will be willing to revisit the issue at that time on motion by the defendants.

■ As to certification of an interlocutory appeal, it too, will be denied. This case will go to trial on schedule. The Court does not find the issue as involving a controlling question of law as to which there is substantial ground for difference of opinion. In addition, the Court does not believe that an immediate appeal from the order will materially advance the ultimate termination of the litigation. To the contrary, an interlocutory appeal will only necessitate further delay and further put off the trying of this lawsuit on the merits.