FOOD LION, INC., Plaintiff,

v.

CAPITAL CITIES/ABC, INC., ABC Holding Co., American Broadcasting Companies, Inc., Lynne Litt, Richard N. Kaplan, Ira Rosen and Susan Barnett, Defendants.

No. 6:92CV00592.

United States District Court,
M.D. North Carolina,
Winston–Salem Division.

Nov. 8, 1996.

W. Andrew Copenhaver, David A. Shirlen, Elizabeth B. McGee, Winston–Salem, NC, Richard L. Wyatt, Jr., Clinton R. Batterson, Washington, DC, Charles Porter, Columbia, SC, for plaintiff.

Harrell H. Stevens, Jr., Katherine A. O'Connor, Raleigh, NC, Randall J. Turk, William H. Jeffress, Jr., Paul F. Enzina, Michael J. Barta, Washington, DC, for defendants.

## MEMORANDUM OPINION

TILLEY, District Judge.

This matter is before the Court on Defendants' Objections, [Doc. # 293], to the United States Magistrate Judge's September 6, 1996 Order, [Doc. # 286], and Defendants' Objections, [Doc. # 399], to the Magistrate Judge's October 21, 1996 Order, [Doc. # 376]. Defendants contend that the Magistrate Judge made a legal error in determining that Plaintiff should be allowed to take limited discovery concerning hidden camera investigations other than the one involving Plaintiff. For the reasons stated below, the Orders of the Magistrate Judge are AFFIRMED.

## I.

The Magistrate Judge has been addressing this issue since at least April 18, 1995 when a hearing was held on several discovery motions, including some motions relating to the discovery of other hidden camera investigations. More recently, the Magistrate Judge issued a Discovery Order which ruled that Plaintiff was allowed to take limited discovery of two hidden camera investigations other than the investigation of Food Lion. [Doc. # 245]. Defendants filed a Motion for Reconsideration, [Doc. # 257], to which Plaintiff responded, [Doc. # 276]. The Magistrate Judge denied the Motion for Reconsideration and reiterated his earlier ruling. [Doc. # 286]. Defendants filed objections to this Order, [Doc. # 293], and Plaintiff responded, [Doc. # 295]. Thereafter, Plaintiff filed a Motion to Compel, [Doc. # 312], which related, in part, to these same hidden camera investigations and Defendants responded, [Doc. # 328]. The Magistrate Judge entered another Order on October 21, 1996, again allowing limited discovery of two hidden camera investigations. [Doc. # 376]. Defendants objected to this latest Order, [Doc. # 399], and Plaintiff responded, [Doc. # 404].

The Magistrate Judge has ruled that Plaintiff should be allowed very limited discovery of two of Defendants' hidden camera investigations besides the one which focused on Plaintiff. In the latest statement of what will be allowed, the Magistrate Judge said

> The major permitted discovery is to be depositional, with the focus on "specific factual predicates" regarding fraud and trespass. There is to be no discovery of videotapes.... ABC shall identify for each of the two investigations in question three reporters or ABC employees who had the greatest role in the hidden-camera investigation. Food Lion may depose each of these for two (2) hours each, concerning the facts of the undercover investigation itself, limited to information which might suggest or support an allegation of fraud

or trespass, and any involvement in the investigation by the UFCW.[1] Document requests 20 and 21 shall be complied with before the depositions, limited to production of written documents gathered or produced by ABC during or within a three-month period before the undercover investigation and further limited to documents reflecting or relating to the unauthorized entry into a non-public portion of a business, misrepresentation of identity, or intentional deception by any ABC employee or agent.

(Order of the United States Magistrate Judge dated Oct. 21, 1996, at 12–13 [Doc. # 376] ). Therefore, the items really at issue here are (1) testimony relating to actions which could reasonably be suggestive of fraud or trespass (for example, efforts to falsify background, references, identities, job skills, etc.);[2] (2) documents regarding those same actions (for example, false resumes, false letters of reference, false items of identification, etc.); and (3) testimony concerning the UFCW's assistance in perpetrating fraud and trespass to facilitate the hidden camera investigations (for example, helping to create false references, putting ABC personnel in touch with individuals who would falsify or assist in falsifying credentials, references, backgrounds, or identifications, and other types of information which involves assisting or facilitating fraudulent activities or episodes of trespass).

The Orders of the Magistrate Judge are reviewed only for clear error or rulings contrary to law. Fed.R.Civ.P. 72(a). Therefore, unless the result compelled by the Magistrate Judge's ruling is contrary to law or clearly erroneous, the Orders of the Magistrate Judge will be affirmed.

1. The "UFCW" is the United Food and Commercial Worker's Union.

2. These parenthetical examples are intended to exemplify the types of information envisioned as fairly being covered by the Discovery Order at issue. The examples are not intended to be an exhaustive list nor are they intended to limit or expand the Magistrate Judge's Orders on this issue. The parties are admonished to read these passages fairly and in the spirit in which they are

## II.

### A. The Journalist's Privilege

The modern journalist's privilege finds its roots in the Supreme Court's decision in *Branzburg v. Hayes,* where the Court, in a 5–4 decision, determined that journalists could not refuse to "respond to relevant questions put to them in the course of a valid grand jury investigation." 408 U.S. 665, 690–91, 92 S.Ct. 2646, 2661, 33 L.Ed.2d 626 (1972). Despite the ultimate answer to the question before it, the Court also stated "[n]or is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated." *Id.* at 681, 92 S.Ct. at 2656. It is this statement and others like it that have led to the development of the journalist's privilege. It is clear that such a privilege has been recognized in most circuits and been created by statute in many states. The question that remains is the exact scope of the privilege.

The development of the journalist's privilege began by shielding journalists from the necessity of revealing confidential sources. *See, e.g., Riley v. City of Chester,* 612 F.2d 708 (3rd Cir.1979). Eventually, however, the privilege was asserted in an attempt to prevent disclosure of nonconfidential information.[3] The Third Circuit was the first court of appeals to address whether the privilege should protect nonconfidential information. *See, United States v. Cuthbertson,* 630 F.2d 139 (3rd Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981). In that case, a criminal defendant sought disclosure of a reporter's notes and film outtakes (material taped but never broadcast). *Id.* at 142. The Third Circuit concluded that "[w]e do not think the [journalist's privilege] can be limited solely to protection of sources.

intended. They are not to be used to create any undue arguments about the scope of this Opinion and Order.

3. The term "nonconfidential information" is used in this context to refer to material gathered or received during the news gathering process which is not received from a source on a promise of confidentiality.

The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes." *Id.* at 147. Other circuit courts have also considered the scope of the journalist's privilege in the context of information not received from a confidential source. The Second Circuit stated that "the relationship between the journalist and his source may be confidential or nonconfidential for purposes of the privilege." *von Bulow v. von Bulow,* 811 F.2d 136, 141 (2nd Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). The First Circuit noted that "[w]e discern a lurking and subtle threat to journalists and their employers if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually ... compelled." *United States v. LaRouche Campaign,* 841 F.2d 1176, 1182 (1st Cir.1988). Furthermore, the Ninth Circuit held that "the journalist's privilege applies to a journalist's resource materials even in the absence of the element of confidentiality." *Shoen v. Shoen,* 5 F.3d 1289, 1295 (9th Cir.1993). It is clear from these cases that many circuits have recognized a privilege which protects nonconfidential information and other editorial or resource material. What is less clear is whether the privilege extends far enough to protect the material Defendants seek to protect in this case.

**B. The Scope of the Privilege in this Case**

**1. The Balancing Process**

■ As every court that has recognized the journalist's privilege has noted, the privilege is qualified. Therefore, the privilege must give way in certain circumstances to countervailing interests. The Fourth Circuit has determined that a balancing test is appropriate to determine if an item should be protected by the journalist's privilege. The court noted that "[i]n determining whether the journalist's privilege will protect the source in a given situation, it is necessary for the district court to balance the interests involved." *LaRouche v. National Broadcasting Co., Inc.,* 780 F.2d 1134, 1139 (4th Cir.), *cert. denied,* 479 U.S. 818, 107 S.Ct. 79, 93 L.Ed.2d 34 (1986). The Fourth Circuit went

on to state that "[t]o aid in the balancing of these interests, courts have developed a three part test: (1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling need in the information." *LaRouche,* 780 F.2d 1134, 1139. This type of balancing approach is grounded in the Supreme Court's *Branzburg v. Hayes* decision. In the context of determining whether a newsman was privileged to refuse to provide testimony to a grand jury, the Supreme Court stated that "[t]he asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Branzburg,* 408 U.S. at 665, 710, 92 S.Ct. at 2648, 2671. The Court went on to say that "[t]he balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." *Id.*

**2. Impact of a Reporter's Tortious Behavior**

Yet another factor which must be considered in this case is the fact that all of the discovery allowed by the Magistrate Judge's Orders goes to actions which could constitute fraud or trespass. This fact certainly must weigh into the calculus of determining whether and how the journalist's privilege will apply in this case.

■ As has long been noted by the courts of this land, the press is not free to violate laws of general applicability in order to reach its ultimate goals. *See, e.g., Cohen v. Cowles Media Co.,* 501 U.S. 663, 669–70, 111 S.Ct. 2513, 2518–19, 115 L.Ed.2d 586 (1991). In *Cohen v. Cowles Media,* the Supreme Court recognized the "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Id.* at 669, 111 S.Ct. at 2518. Furthermore, the Supreme Court "has emphasized that '[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liber-

ties of others.'" *Branzburg,* 408 U.S. at 683, 92 S.Ct. at 2657 (citing *Associated Press v. N.L.R.B.,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 656, 81 L.Ed. 953 (1937)). The *Branzburg* Court also noted that "[i]t has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg,* 408 U.S. at 684, 92 S.Ct. at 2658.

Only one case has been found where the court was confronted with the impact a reporter's own wrongdoing should have on a party's subsequent discovery request to obtain the ill-gotten information.[4] In *United States v. Sanusi,* the Eastern District of New York addressed a situation where a CBS news team accompanied the Secret Service while they executed a search warrant in defendant's home. 813 F.Supp. 149 (E.D.N.Y. 1992). The defendant eventually subpoenaed the videotape which CBS made during the agents' search. The tape had never been broadcast. The *Sanusi* court determined that the actions of the CBS reporters constituted trespass. The court stated "[t]hat CBS trespassed upon defendant's home and engaged in conduct, with the connivance of the government, directly contrary to Fourth Amendment principles, however, directly bears upon the court's evaluation of CBS's newsgathering privilege." In *Sanusi,* the court determined that it was appropriate to add another step to the determination of whether the journalist's privilege will protect the information sought. The court set out its test as follows:

 To conclude that a member of the press is entitled to resist a subpoena, a court must reach two distinct findings. First, it must determine that the interests of the litigant in seeking the material are not so strong as to override the First Amendment privilege. Sensitive application of the settled three-part test for overcoming the qualified privilege accomplishes this task.... Second,

the court must be confident that the person asserting the privilege does not do so as a means of justifying otherwise illegal conduct.

*Sanusi,* 813 F.Supp. at 156. This approach is proper and seems to take into account all of the necessary competing factors. Thus, the *Sanusi* test will be applied here.

C. Application in this Case

1. The Three Part Balancing Test

 Plaintiff claims it has a compelling need for the information sought for three reasons: (1) to support its claim under the North Carolina Unfair and Deceptive Trade Practices Act; (2) to support its claim for punitive damages; (3) and as evidence of ABC's intent which is relevant to several of Plaintiff's causes of action and several of ABC's defenses. (Pl.'s Opp'n to Def.'s Mot. for Reconsideration of August 12 Order, at 6–7 [Doc. # 276] ). A review of the record concerning these matters reveals that this information is relevant to Plaintiff's case. The information sought goes to intentionally tortious activities on the part of the Defendants, and is therefore not available from any other source. Furthermore, Plaintiff's need for this information is sufficiently compelling to warrant discovery of these materials. The three part test established by the Fourth Circuit in *LaRouche* is satisfied in this case. The results compelled by the Orders of the Magistrate Judge are not clearly erroneous or contrary to law and therefore should be affirmed.

2. The Impact of ABC's Behavior

Even if the three part test were not satisfied, another factor may counsel against the application of the privilege in this case. This is the fact that all of the discovery allowed by the October 21 Order is aimed at the discovery of tortious activity. As the *Sanusi* court noted, "[t]he First Amendment is a shield, not a sword. Even a reporter must accept

---

4. Several courts have addressed factors which impact the application of the journalist's privilege. *See, e.g., United States v. Markiewicz,* 732 F.Supp. 316 (N.D.N.Y.1990) (noting that several factors diminish the weight of the privilege: (1) the trial is criminal; (2) the information sought is not confidential in nature; (3) a reporter's

testimony (rather than documents) is sought; (4) questions put to reporter are narrowly limited; (5) case is a libel case; (6) type of questions asked do not pose significant interference with First Amendment principles (for instance, was a story truly published on a certain date?)).

limits on how far upon another person's privacy he or she may intrude." The Supreme Court in *Branzburg* noted that "[t]he Amendment does not reach so far as to override the interest of the public in ensuring that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to all other persons." 408 U.S. at 691–92, 92 S.Ct. at 2662. The Court then goes on to state that "[t]o assert the contrary proposition 'is to answer it, since it involves in its very statement the contention that the freedom of the press is the freedom to do wrong with impunity.'" *Id.* (citing *Toledo Newspaper Co. v. United States,* 247 U.S. 402, 419–20, 38 S.Ct. 560, 564, 62 L.Ed. 1186 (1918)). To allow ABC to hide behind a qualified First Amendment privilege in order to camouflage tortious behavior on the part of its agents and employees is unacceptable.

 It is fundamental that the press is and should be governed by the same generally applicable laws that order the rest of society. Even the attorney-client privilege, which is more deeply rooted and absolute than the journalist's privilege, gives way in the face of communications made for the purpose of furthering a crime or a fraud. *See, e.g., In re Grand Jury Subpoena,* 884 F.2d 124, 127 (4th Cir.1989). The journalist's privilege should not be expanded to allow concealment of relevant evidence of wrongdoing solely because the wrongdoer was in pursuit of a story.

Defendants assert that this ruling is unprecedented because the discovery involves investigations which did not involve Plaintiff. (Defs.' Objections to Sept. 6, 1996 Order, at 1). The question is clearly a closer one than it would be if the discovery was directed toward Defendants' investigation of Plaintiff. However, the information is relevant to Plaintiff's case and claims. This is not a situation where the Plaintiff is allowed to trample through Defendants' affairs for a reason no more compelling than curiosity. Furthermore, the *Sanusi* court compelled discovery from a third-party witness. In this case, the actions that are the subject of the discovery are the actions of a party to this case. The discovery is very narrowly drawn and is limited to two other hidden camera investigations. This very limited discovery is appropriate here.

**D. Further Protection for Privileged Information**

This Order approves the result of the Magistrate Judge's October 21 and September 6 Orders. The discovery allowed is anticipated to cover tortious behavior on the part of ABC's employees or agents. Still, there is a possibility that, in the course of asking questions which might lead to the discovery of tortious activity, some answers might contain information which should properly be subject to the newsgathering privilege. To guard against any infringement on the privilege, the Magistrate Judge has agreed to review the documents and sit in on the depositions that will be taken in this matter. Because the depositions are limited in number to six and in length to two hours apiece, this is a feasible solution. If a question is asked and Defendants feel that the answer could be privileged under the guidelines established above, then the Magistrate Judge can hear the answer out of the presence of Plaintiff's counsel and determine whether the privilege would be violated by disclosure.

### III.

Therefore, for the reasons stated above, the journalist's privilege does not protect the limited discovery of two hidden camera investigations other than the one involving Plaintiff to the extent that those two investigations involved tortious activity. The Magistrate Judge's Orders were not clearly erroneous or contrary to law. The Court dispenses with oral argument and AFFIRMS the Orders of the United States Magistrate Judge. [Doc. # 286, Doc. # 376]. The parties are directed to proceed with discovery on this issue.