FOOD LION, INC., Plaintiff,

v.

CAPITAL CITIES/ABC, INC., ABC Holding Co., American Broadcasting Companies, Inc., Lynne Litt, Richard N. Kaplan, Ira Rosen and Susan Barnett, Defendants.

No. 6:92CV592.

United States District Court,
M.D. North Carolina,
Winston–Salem Division.

March 21, 1995.

812

Andrew Copenhaver, Winston–Salem, NC, John J. Walsh, New York City, for plaintiff.

Harrell Hugh Stevens, Jr., Jerry S. Alvis, Raleigh, NC, Randall J. Turk, Washington, DC, for defendants.

## MEMORANDUM OPINION

TILLEY, District Judge.

Plaintiff Food Lion has brought this action against Defendant Capital Cities/ABC, Inc. ("ABC") for injuries suffered as a result of ABC's undercover investigation of Food Lion's operational practices and subsequent broadcast on *Prime Time Live,* an ABC television production. Specifically, Food Lion alleges (1) state tort law violations of intentional misrepresentation, deceit, fraud, negligent supervision, trespass, breach of fiduciary duty, and respondeat superior; (2) civil conspiracy; (3) violations of federal wiretapping laws; (4) unfair and deceptive trade practices in violation of North Carolina General Statute § 75–1.1; and (5) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*. ABC moved to dismiss all claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Additionally, defendant Barnett moved to dismiss all claims against

her based on an asserted lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Magistrate Judge Sharp's Recommendation determined that ABC's motion to dismiss should be denied as to Claims One, Three, and Fourteen of the Amended Complaint (Food Lion's state law claims of fraud, trespass, and civil conspiracy) and should be granted as to Claims Six and Seven (Food Lion's wiretapping claims) and Claims Nine through Thirteen (Food Lion's civil RICO claims). As to Claims Two, Four, Five, and Eight (Food Lion's claims of negligent supervision, respondeat superior, breach of fiduciary duty, and unfair and deceptive trade practices), the Magistrate Judge recommended that ABC's motion to dismiss be deferred under Rule 12(d) until trial or summary judgment adjudication. Additionally, it was recommended that Defendant Barnett's motion to dismiss for lack of personal jurisdiction be denied. Both Food Lion and ABC have sought reconsideration by this Court, pursuant to Rule 72(b).

Upon review of the Magistrate Judge's Recommendation, the parties' objections and responses, and after a *de novo* review of the issues presented, this Court adopts the results recommended as to each of the claims and adopts the reasoning as to Counts One through Eight and Fourteen as well as the result and reasoning as to Defendant Barnett's Rule 12(b)(2) motion. Counts Nine through Thirteen, the civil Rico claims, will be dismissed pursuant to the following discussion.

## I.

■ Defendants seek an order dismissing all claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The 12(b)(6) motion tests only the legal sufficiency of the complaint and does not speak to the plaintiff's ability to prove the facts alleged. In ruling on Defendants' 12(b)(6) motion to dismiss Food Lion's amended complaint, the Court should accept as true all well-pleaded allegations, and, viewing the complaint in a light most favorable to the plaintiff, should not dismiss the case unless it appears certain that the plaintiff can prove no set of facts which would entitle it to relief. *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994).

Plaintiff's complaint in this case is forty-seven pages long. The facts alleged in the complaint and stated in the light most favorable to Food Lion, the non-moving party, depict the following: Food Lion, Inc. ("Food Lion") is a corporation organized under the laws of the State of North Carolina and has its principal office and place of business in Salisbury, North Carolina. Food Lion is an operator of retail food supermarkets throughout the southeastern United States.

*Prime Time Live* ("PTL") is an ABC network news show. The show airs in prime viewing time in order to capture the largest possible audience. PTL is not a "straight news" program; instead, PTL presents "undercover," "investigative" and "inside" stories of a sensational nature designed to attract large audiences and Nielsen ratings, with the commensurate financial rewards and status within the television industry. PTL first aired in August of 1989. The subject matter and content of PTL broadcasts are subject to the control and supervision of Capital Cities/ABC, Inc., ABC Holding Co., and American Broadcasting Companies Inc. Richard Kaplan was the executive producer of PTL during all relevant time periods. Ira Rosen was the senior producer of PTL during all relevant time periods. Susan Barnett was an associate producer and Lynne Litt was an employee of PTL.

PTL seeks one "amazing" piece per week. Undercover investigations are one important means by which PTL obtains such "amazing" stories as necessary to meet its goal of attracting large prime time audiences. PTL has undertaken as many as thirty-six undercover operations (to the date of the amended complaint) involving the use of hidden cameras. The use of hidden cameras requires the use of falsehoods, misrepresentations and deceit in order to position recording equipment and to entice persons into actions or statements which can be recorded. ABC also produces other programs in which it has aired stories based on undercover operations involving the use of hidden cameras. ABC

regularly conducts undercover operations and has procedures and policies to facilitate these efforts. ABC's News Policy Manual provides that "[i]n the course of investigative work, reporters should not disguise their identity or pose as someone with another occupation without prior approval of ABC News Management." The ABC News Policy Manual states that "news gathering of whatever sort does not include any license to violate the law."

In December of 1991, Lynne Litt received a suggestion from persons working on behalf of the United Food & Commercial Workers International Union ("UFCW") that Food Lion might present a subject for investigation. At about the same time, ABC associate producer Susan Barnett received information from a group called the Government Accountability Project ("GAP") suggesting that Food Lion would be a good target for investigation. GAP was closely aligned with the UFCW and the information that GAP gave to Barnett came from UFCW. The UFCW has been trying unsuccessfully to organize Food Lion employees for more than a decade. The UFCW has publicly acknowledged that it has been conducting an intense "corporate campaign" with the stated goal of unionizing Food Lion or putting it out of business. The UFCW has instigated administrative or legislative investigations by various governmental authorities by alleging violations of law or regulations on the part of Food Lion. In addition, it has financially supported litigation against Food Lion, and has courted and utilized the media to get widespread publicity for its charges.

In early 1992, Litt and Barnett submitted, independently, proposals for a PTL story on Food Lion. These proposals were approved by ABC management, and it was determined that undercover or hidden camera work would be necessary to develop the story. Litt and Barnett were told to begin work and to report to Ira Rosen. Rosen emphasized to Litt and Barnett that every step of the undercover work would need to be approved by upper management of ABC.

Litt decided that the best way to obtain the sensational footage they were seeking was for her, Barnett, and others to obtain employment with Food Lion. They would then arrange for tiny video cameras and audio equipment to be secreted on their persons, which they would then use to record the actions and statements of other Food Lion employees. Litt and Barnett were aware that if they used their true identities Food Lion would not hire them.

Litt, Barnett, and others utilized means including the mails and interstate wire facilities to create false identities and backgrounds, complete with supporting documentation. Litt turned to the UFCW, which Litt knew or should have known was engaging in a public campaign against Food Lion, to help her provide references for the background checks that Food Lion would conduct in reviewing applications for employment.

In March 1992, Litt wanted to review a Food Lion employment application prior to the attempt to gain employment for herself and others. Litt, operating from Atlanta, called Nicholas Clark, a Washington, D.C. based in-house lawyer for UFCW. Clark supplied Litt with the name of a former Food Lion employee. The former employee provided Litt with Food Lion employment applications. Litt telecopied copies of the application to New York, so that Barnett could practice filling out the application. Litt also sought Food Lion applications through Neel Lattimore, who did public relations work for UFCW. Litt received additional applications by telecopy in Atlanta from Lattimore in New York.

Later in March 1992, Litt had further conversations with Clark. Litt told Clark that she was an undercover operative for ABC and that her identity and the nature of the story needed to remain secret. Clark suggested that Litt seek employment with Food Lion as a deli clerk, and he or Harry Carter (a colleague of Clark's) arranged for her to view deli workers in a unionized supermarket on a "no questions asked basis."

In another telephone conversation in March 1992, Litt asked Clark to find a supermarket in Pennsylvania that Litt could use as an employment reference. Litt explained to Clark that she needed a store in Pennsylvania to fit the background that she had creat-

ed for herself. Subsequently, Litt was telephoned by Clark or Carter and given the name of Dale Moss at "Moss Shop 'n Save," in Uniontown, Pennsylvania and an address and telephone number to use as a false reference. Still later, Litt requested that Clark obtain a false letter of recommendation from a supermarket. Litt received such a letter from Moss either through the mails or by Federal Express. The false letter of recommendation was reviewed by Rosen and upper management of ABC.

Litt's dentist, Dr. David Zelby of Atlanta, agreed to give her a false letter of reference stating that she had been employed as Zelby's receptionist. Litt obtained stationary from the doctor's office and typed the letter herself. She then telecopied a copy of the letter to New York for approval by Rosen, ABC management, and the Capital Cities legal department.

Litt first attempted to gain employment at two Food Lion stores in the Savannah, Georgia area. She submitted false references and completed the Food Lion application using a false name, false background, false employment history, and false reasons for seeking work in a Food Lion store. Litt was unsuccessful in her initial attempt to become a Food Lion employee.

Litt then contacted Clark, and together they decided that she should try again, this time seeking employment as a meat wrapper. Clark told Litt to go to a unionized food store in Atlanta where she would be shown and could practice the functions of a meat wrapper. Litt was to meet a man named "Bobby Adams" and to identify herself as "Jane Adams." Bobby Adams is the president of the Atlanta local of the UFCW.

Barnett, with Litt's assistance, also created a false identity, background, and documentation to facilitate her attempt to gain employment with Food Lion. Clark, in another phone conversation with Litt, agreed to provide another false employment reference for Barnett to use. The reference was from a Chicago area supermarket. Litt and Barnett discussed both applications in a series of interstate telephone calls in March and April 1992. Barnett's false persona, documenta-

tion and application were reviewed by Rosen and ABC management.

Other than Litt and Barnett, ABC undertook numerous other attempts to infiltrate Food Lion. Litt reviewed and typed a Food Lion employment application for Kenneth Ray Jordan, an Atlanta acquaintance of Litt's. Litt promised Jordan that if he could gain employment at Food Lion, ABC would pay him $100 per day. Litt passed on Jordan's application to a Food Lion employee whose name was given to her by Clark. The Food Lion employee was to pass it on to appropriate personnel at Food Lion. Litt also telecopied a copy of Jordan's application to New York for Rosen and ABC to review.

ABC also attempted to place Ron Hill, a video expert, into a Food Lion warehouse where Hill would surreptitiously film Food Lion activities. Litt assisted Hill in the preparation of his false identity and documentation. Hill provided ABC with the video and sound equipment used by Litt, Barnett, and others to film hidden camera footage in and around Food Lion stores. The arrangements between Hill, Litt, and ABC required numerous phone calls and mailings.

ABC also attempted to plant Steve Bell, a colleague of Hill's, in a Food Lion facility. Litt assisted in the preparation of Bell's false identity and documentation. Clark provided a false reference for Bell from a unionized store called "Magruders," in Maryland. Clark told Litt of this arrangement in a phone call from Washington, D.C. to South Carolina.

In late April 1992, Litt submitted further employment applications to Food Lion using the name Lynne Neufer and/or Neufes ("Neufes"). She applied for the positions of "meat wrapper" or "meat clerk." She did not disclose her full time employment with ABC and PTL. She falsely represented her address. She falsely represented her employment history and gave false references using the pre-arranged information furnished by Clark. She also gave a false statement indicating her reasons for seeking employment. Her intent was to deceive Food Lion into offering her a job so she could gain access to areas not open to the public. Food

Lion would not have hired Litt had she revealed her true identity and purpose.

Bill Howard, an area meat department supervisor for Food Lion in Hickory, North Carolina, interviewed Litt on May 1, 1992. Litt maintained her false identity and statements during the interview. Food Lion received a false confirmation of employment from Moss Shop 'n Save. Howard then offered Litt a job with Food Lion which she accepted.

Litt started work on May 4, 1992. She quit on May 15, 1992. During her employment with Food Lion, Litt worked at two different stores. Food Lion undertook efforts to train Litt to perform the job for which she was hired. On the day she quit, Litt stated that her grandfather had died and that she was moving to Pennsylvania to care for her grandmother. She did not inform Food Lion of her association with PTL or about the hidden camera filming that she had done.

While employed at Food Lion, Litt was an unsatisfactory employee. She worked slowly and did not appear to have experience in meat wrapping. Through neglect or hidden motive, she failed to perform her cleaning responsibilities adequately. One evening in particular, Litt was given the task of cleaning the meat cutting and wrapping room after the meat market had closed. Her cleaning responsibilities were to be done while she was alone in the meat market, giving her the opportunity to create camera footage about meat handling and/or sanitation. The next morning the manager noticed that Litt had failed to perform a proper cleaning. She had left scraps of meat and bone dust from the meat saw on the floor, and had failed to clean thoroughly other areas that would normally have been cleaned at the close of a work day.

While employed by Food Lion, Litt concealed and surreptitiously used a video recorder, camera, tape recording device, and/or other video and audio recording devices, including a wireless radio transmitter about Food Lion's premises. Litt's sole purpose during her employment with Food Lion was to conduct an investigation. Litt had no intention of faithfully performing the duties for which she was hired.

Barnett submitted a written application for employment with Food Lion as a deli clerk on April 4, 1992. In the application, Barnett made false statements consistent with the false background that she and Litt had previously prepared. Her intent was to deceive Food Lion into offering her employment. At no time during the application process or during her employment did Barnett inform Food Lion of her true identity and purpose. Food Lion would not have hired Barnett had it known the truth.

Brenda Sparks interviewed Barnett based on the employment application. Barnett maintained her false identity and statements in the interview. After receiving a false confirmation of prior employment, Food Lion offered Barnett a job. Barnett accepted and began work on April 14, 1992 in Myrtle Beach, South Carolina. Food Lion took efforts to train Barnett and put her on the payroll. Barnett worked for eight days and then complained of personal problems. She was given time off and never returned. While employed at Food Lion, while on Food Lion's premises, and without Food Lion's knowledge or permission Barnett concealed and used various video and audio recording equipment. Barnett never intended to faithfully perform the duties for which she was hired. Instead, her sole purpose was to obtain information for use on PTL.

PTL reviewed more than 50 hours of hidden camera footage taken at the Food Lion stores by PTL agents. Eventually, PTL aired five or six minutes of footage on its November 5, 1992 broadcast. The footage was used to support allegations made by several former Food Lion employees and statements made by PTL anchor Diane Sawyer. Without the footage, PTL would not have broadcast the Food Lion story. More viewers watched the Food Lion episode of PTL than any previous PTL program. Immediately following the broadcast, Food Lion's suffered a drop in retail sales and the value of its publicly traded securities decreased.

## II.

Food Lion's amended complaint enumerates fourteen counts which allege a combina-

tion of state and federal claims against various defendants. Defendants attack the legal sufficiency of the complaint by arguing, under each count, that Plaintiff has failed to allege facts supporting the respective claims. In addition, Defendants seek dismissal of the entire complaint on First Amendment grounds.

Claims Nine through Thirteen of the amended complaint allege violations of the civil RICO statutes based on the predicate acts of mail and wire fraud. *See* 18 U.S.C.A. §§ 1961, 1962, 1963, 1964, 1341, 1343. Defendants' brief states, generally, five grounds on which it is argued that Plaintiff's RICO claims should be dismissed: (1) failure to allege parts of the required predicate acts of mail and wire fraud, particularly a failure to allege a "scheme to defraud" Food Lion; (2) failure to allege a "pattern" of racketeering activity; (3) failure to allege a valid RICO "enterprise"; (4) failure to allege a § 1962 violation; and, (5) failure to allege causation of damages from any RICO violation. In addition, Defendants have argued that Plaintiff failed to plead certain points with the specificity necessary to satisfy Rule 9(b). Defendants also argue two other points, first that punitive damages are not available under RICO and that the "pattern" requirement is unconstitutional on its face and as applied to them. Because, as discussed below, Food Lion has failed to allege sufficiently a pattern of racketeering activity, its RICO claims fail. Since they are not necessary, Defendants' other attacks on the claims will not be discussed.

### III.

■ The elements of a civil RICO claim are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Eastern Pub. & Adv. v. Chesapeake Pub. & Adv.*, 831 F.2d 488, 491–92 (4th Cir. 1987), *cert. granted, judgment vacated, and case remanded on other grounds*, 492 U.S. 913, 109 S.Ct. 3234, 106 L.Ed.2d 582 (1989) (dismissing for failure to allege pattern of racketeering activity). The Plaintiff must al-

lege each element to avoid dismissal under Rule 12(b)(6).

For the purpose of the RICO statute, racketeering activity includes violations of 18 U.S.C. §§ 1341 and 1343, mail and wire fraud respectively. 18 U.S.C. § 1961(1)(B). Plaintiff alleges mail and wire fraud as the predicate acts supporting its civil RICO claims and must allege facts supporting each element of criminal liability under those statutes as well. The elements of a wire fraud offense are (1) a scheme to ·defraud and (2) the use of wire communications affecting interstate or foreign commerce in furtherance of the scheme. *Belt v. United States*, 868 F.2d 1208 (11th Cir.1989); *see also* 18 U.S.C. § 1343. The elements of a mail fraud offense are (1) a scheme to defraud and (2) the use of the mails in furtherance of the scheme. *See* 18 U.S.C. § 1341. The statutes are construed similarly, and the same substantive analysis is used with both statutes. *Carpenter v. United States*, 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987).

An essential element of a RICO claim is that defendant engage in a pattern of racketeering activity. *See* 18 U.S.C. § 1962. The statutory definition of pattern requires at least two acts of racketeering activity. 18 U.S.C. § 1961(5); *see also Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (two acts of racketeering activity are necessary but may not be sufficient to meet the pattern requirement).

■ The Supreme Court addressed RICO's pattern requirement in *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In *H.J.*, the Court discussed the statutory definition of § 1961(5) and found that it established an outer limit on the definition of pattern. *Id.* at 237, 109 S.Ct. at 2899. The Court considered the statutory language and relevant legislative history and established a two part test to determine if a pattern exists. First, the predicate acts must be related, and second, the predicate acts must amount to or pose a threat of continued criminal activity. *Id.* at 239, 109 S.Ct. at 2900.

To be related, predicate acts must have "the same or similar purposes, results, participants, victims, or methods of commission

or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)). Defendants do not assert that Food Lion's RICO claims fail to meet the relatedness aspect of the pattern requirement. All the alleged predicate acts of mail fraud and wire fraud either were directed toward Food Lion or were part of schemes to defraud other targets of investigations seeking information for use on PTL and other news shows. These acts share the common purpose of gaining information through fraudulent means. The alleged predicate acts are sufficiently related to establish a pattern of racketeering activity.

The continuity aspect of the pattern requirement may be established by showing either closed or open-ended continuity. The Supreme Court in *H.J.* stated:

> Continuity is both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicate acts must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*H.J.*, 492 U.S. at 241–42, 109 S.Ct. at 2902 (citations omitted). An assessment of whether a pattern exists does not involve a formulaic approach and, rather, must involve consideration of the facts of each case. *Id.* at 242, 109 S.Ct. at 2902; *see also Menasco v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989).

■ An evaluation of continuity, whether closed or open-ended, involves an examination of the alleged predicate acts. *See H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902 (stating that RICO's predicate acts or offenses must be continuous). The predicate acts specifically alleged by Food Lion in the amended complaint consist of a series of letters, phone calls, and facsimiles, which Food Lion contends amount to mail and wire fraud, and which occurred over a two month period in March and April of 1992. (Am.Compl. ¶¶ 151–52.) In addition, Food Lion alleges that the scheme to defraud element of mail and wire fraud began in December 1991. (Am.Compl. ¶¶ 23–24, 156.) For the purposes of this motion only, it will be assumed that Food Lion could prove that the defendants engaged in a scheme to defraud Food Lion and that the scheme began in December 1991. Thus, the predicate acts of mail and wire fraud will be considered to have begun in December 1991.

Food Lion postulates that the scheme to defraud continued at least until March 11, 1993 when the latest PTL segment concerning Food Lion aired and that the scheme continues with each subsequent broadcast on the subject. (*See* Am.Compl. ¶ 156.) This argument is unpersuasive. Food Lion asserts that the purpose of the fraudulent acts was to gain access to areas not open to the public and to gain information about its operations. (*See* Am.Compl. ¶¶ 58, 61, 62.) Food Lion does not allege that the airing of the PTL segments constituted an act of mail or wire fraud. Any subsequent use of the information does not constitute mail or wire fraud, and as such, cannot be used to establish continuity. The scheme to defraud concluded when its purpose, to collect information, was realized. Accordingly, the predicate acts of mail and wire fraud ceased as of May, 1992 after Defendants Litt and Barnett were no longer employed by Food Lion. For the purposes of this motion and assuming all well-pleaded allegations to be true, it is determined that Defendants engaged in a series of predicate acts directed toward Food Lion which occurred between December, 1991 and May, 1992, a six month span.

■ Food Lion alleges in its complaint that Defendants ABC and Capital Cities have engaged previously in other acts of mail and wire fraud in investigations similar to that directed toward Food Lion. (*See* Am.Compl. ¶¶ 18–22.) The allegations of fraud which serve as predicate acts for RICO claims are not exempt from the pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure, and thus, the circumstances of the fraud must be stated with particularity. *Estate of Dearing v. Dearing,* 646 F.Supp. 903, 913 (S.D.W.Va.1986); *see* Fed.R.Civ.P. 9(b). Food Lion provides no details regarding the prior use of any mail or wire fraud by Defendants in investigations, nor does Food Lion identify any other persons defrauded by Defendants. *See Menasco v. Wasserman,* 886 F.2d 681, 683 (4th Cir.1989) (declining to consider allegation that defendant "committed fraudulent acts against various individuals" in assessing continuity). Food Lion has not alleged with sufficient particularity that Defendants have engaged in other acts of mail and wire fraud directed at persons other than Food Lion. As such, this allegation will not be considered for the purposes of establishing continuity.

■ As discussed above, a pattern may be found based on either open-ended or closed continuity. Food Lion has attempted to use both types of continuity to establish that Defendants engaged in a pattern of racketeering activity. Open-ended continuity may exist when the predicate acts are "part of an ongoing entity's regular way of doing business." *H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902. Food Lion postulates that it has alleged facts that if proven would establish that open-ended continuity exists. In its answer to the original complaint, the Defendants stated "[a]n undercover investigation, including the use of hidden cameras and microphones, is an important and accepted journalistic technique." (Answer to Original Compl. ¶ 1.) From this statement, Food Lion concludes that Defendants

> consider themselves to have the right to commit these crimes and torts [the illegal acts allegedly committed by Defendants].... Thus, the defendants have acknowledged that the predicate acts and offenses alleged herein are part of the regular way of conducting the ongoing otherwise-legitimate business of ABC and Capital Cities.

(Am.Compl. ¶ 156.) Food Lion's conclusion depends on the key assumption that undercover reporting necessarily entails criminal conduct which would qualify as a predicate act such as mail or wire fraud. However, the use of a hidden camera in no way requires the use of the mails or of wire communications. This Court declines to equate the use of hidden cameras and microphones with mail and wire fraud. This said, Food Lion's complaint alleges only that Defendants regularly use hidden cameras and microphones in their regular business activities. The complaint does not allege that Defendants regularly engage in mail and wire fraud, and without that allegation, it is not shown that the predicate acts are a regular way of conducting Defendants' business. Food Lion has not established open-ended continuity.

■ Food Lion also attempts to establish that Defendants' predicate acts have closed continuity. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902. As discussed above, the alleged predicate acts occurred over a span of six months. Although the inquiry into continuity does not involve the application of a formula, cases previously decided in this circuit provide valuable insight into the concept. In *Parcoil Corp. v. Nowsco Well Service, Ltd.,* 887 F.2d 502, 504 (4th Cir.1989), the Fourth Circuit found that the alleged scheme, involving seventeen false reports mailed over a period of four months and directed at one victim, did not have sufficient continuity to apply RICO. Similarly, in *Menasco v. Wasserman,* 886 F.2d 681, 683 (4th Cir.1989), continuity was found to be lacking in a scheme directed toward two victims and lasting for a period of one year. It is instructive to contrast these opinions with cases in which continuity was found to be present. *See, e.g., Busby v. Crown Supply, Inc.,* 896 F.2d 833, 836 n. 2 (4th Cir.1990) (stating that scheme lasting in

excess of ten years and defrauding over 100 salesmen satisfied closed continuity requirement); *Walk v. Baltimore and Ohio R.R.,* 890 F.2d 688, 690 (4th Cir.1989) (holding that activity extending over a ten year period constituted closed continuity). This Court previously has surveyed Fourth Circuit cases addressing continuity. *See Andrews v. Fitzgerald,* 823 F.Supp. 356, 372–73 (M.D.N.C. 1993). In *Andrews,* this Court determined that a three year scheme with a single fraudulent goal and directed at ninety-one victims was "in the grey area of the pattern requirement" and declined to dismiss the RICO claims. *Id.* at 373.

A series of predicate acts occurring over a six month span and directed at one victim cannot be said to possess closed continuity. The acts of mail and wire fraud were part of a limited purpose, to obtain information from Food Lion to be aired on PTL. A survey of case law in the Fourth Circuit indicates that continuity has never been found in a scheme with such a limited duration. Indeed, Food Lion has not cited any cases which involved schemes over a time span less than ten months. As the Fourth Circuit pointed out in *Menasco,* 886 F.2d at 685, the pattern requirement is designed to prevent the transformation of an ordinary fraud case into a federal RICO claim. Food Lion's alleged claims of predicate acts by the Defendants do not possess continuity. Without continuity, be it closed or open-ended, no pattern exists. Since Food Lion has failed to meet the pattern element, its RICO claims must fail. Therefore, claims Nine, Ten, Eleven, Twelve, and Thirteen of the amended complaint are DISMISSED pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### IV.

In its third claim, Food Lion seeks to recover for trespass under North Carolina law. Judge Sharp has recommended that Defendants' motion to dismiss this claim should be denied. Defendants have objected to this recommendation asserting that Food Lion consented to the entry, and that this consent bars any recovery. Even after assuming that the entry was consensual, the trespass claim is not barred.

Under North Carolina law, consent to enter upon real property can be negated by a subsequent wrongful act in excess or in abuse of the authority to enter. *See Blackwood v. Cates,* 297 N.C. 163, 166, 254 S.E.2d 7 (1979). Food Lion has alleged that defendants Litt and Barnett engaged in fraudulent conduct against it. Assuming that the factual allegations supporting the fraud claim are true, this claim could constitute wrongful conduct which could negate any consent to enter given by Food Lion. It is not certain that Food Lion cannot prove a set of facts which would entitle it to relief on its trespass claim. For this reason and the reasons set forth in the Magistrate Judge's Recommendation, Defendants' motion to dismiss claim Three is DENIED.

Claim One of the amended complaint asserts a claim of common law fraud. In its sixth and seventh claims, Food Lion attempts to recover for violations of federal wiretapping statutes. Food Lion's fourteenth claim asserts a claim for civil conspiracy. The Court adopts the Magistrate Judge's Recommendation as to these claims. Accordingly, Defendants' motions to dismiss claim One and Fourteen are DENIED, and Defendants' motions to dismiss claims Six and Seven are GRANTED. Additionally, the Magistrate Judge has recommended that the motion to dismiss claims Two, Four, Five, and Eight, which assert claims for negligent supervision, respondeat superior liability, breach of fiduciary duty and constructive fraud, and unfair and deceptive trade practices be deferred pursuant to Rule 12(d). The Court adopts this recommendation. The motions to dismiss claims Two, Four, Five, and Eight are DEFERRED.

### V.

The Magistrate Judge's Recommendation proposed limiting all of Food Lion's claims to exclude any award of damages to Food Lion resulting from alleged injury to its reputation due to the broadcast of the PTL segment. Food Lion has objected to any such limit on its damages while Defendants have asserted continuously that the entire complaint should be dismissed as violative of the First Amendment.

Food Lion cites the Supreme Court's decision in *Cohen v. Cowles Media Co.*, 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) for the proposition that the First Amendment does not prevent a plaintiff from recovering damages when the press has violated a law of general applicability. ABC does not dispute this reading of *Cohen* but, instead, argues that *Cohen* is only the beginning of the analysis. ABC further argues that the Supreme Court's decision in *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) applies and that a public figure cannot use a law of general applicability to recover reputation damages without establishing the strict requirements of a defamation claim. For reasons discussed below, under *Cohen*, the First Amendment does not bar Food Lion's claims for damages under its remaining claims. However, as argued by ABC, this finding does not end the analysis. This Court also finds that under *Hustler*, Food Lion cannot use its remaining claims to recover damages for injury to its reputation.

In *Cohen*, during the 1982 Minnesota gubernatorial campaign, the plaintiff (Dan Cohen), who was affiliated with one party, gave information about another party's candidate to two of the defendant publishers' newspapers. *Id.* at 665, 111 S.Ct. at 2516. Cohen provided the information in return for the newspapers' promises of confidentiality as to his identity. *Id.* Eventually, both newspapers decided to reveal Cohen's identity as part of their stories. On the same day that the stories were published, Cohen was fired by his employer. *Id.* Cohen sued the defendant publisher in Minnesota state court, alleging fraudulent misrepresentation and breach of contract.

The trial court rejected the defendant's argument that the First Amendment barred Cohen's cause of action. Subsequently, the jury awarded Cohen $200,000 in compensatory damages and $500,000 in punitive damages. On appeal, the Minnesota Court of Appeals affirmed the compensatory damages award but reversed the punitive damages award. *See Cohen v. Cowles Media Co.*, 445 N.W.2d 248 (Minn.App.1989).

The Minnesota Supreme Court reversed the compensatory damages award, finding

that "a contract cause of action is inappropriate for these particular circumstances." *See Cohen v. Cowles Media Co.*, 457 N.W.2d 199, 203 (Minn.1990). Subsequently, the court addressed whether Cohen could assert an action based upon promissory estoppel. The court then determined that "in this case enforcement of the promise of confidentiality under a promissory estoppel theory would violate defendants' First Amendment rights." *Id.* at 205.

On appeal, the Supreme Court reversed the Minnesota Supreme Court and held that the First Amendment did not prohibit Cohen from recovering damages under promissory estoppel. *Cohen*, 501 U.S. at 665, 111 S.Ct. at 2516. The Court specifically noted that there is a "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Id.* at 669, 111 S.Ct. at 2518. The Court in *Cohen* continued:

> As the cases relied on by respondents recognize, the truthful information sought to be published must have been lawfully acquired. The press may not with impunity break and enter an office or dwelling to gather news. It is therefore beyond dispute that the publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others. Accordingly, enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations.

*Id.* (internal citations omitted); *see also Branzburg v. Hayes*, 408 U.S. 665, 691, 692, 92 S.Ct. 2646, 2661, 2662, 33 L.Ed.2d 626 (1972) (stating that "[i]t would be frivolous to assert ... that the First Amendment, in the interest of securing news or otherwise, confers a license on the [press] to violate valid ... laws. The Amendment does not reach so far as to override the interest of the public in ensuring that [the press] is [not] invading the rights of other citizens through reprehensible conduct forbidden to all other persons."). The *Cohen* Court then determined that since

the doctrine of promissory estoppel was a law of general applicability, "the First Amendment does not forbid its application to the press." *Id.* at 670, 111 S.Ct. at 2519. Thus, under *Cohen,* the First Amendment does not protect the press when it violates generally applicable criminal or civil laws in the name of newsgathering.

In this case, Food Lion has alleged that ABC has committed fraud, trespass, and other wrongful acts. Like promissory estoppel, the laws governing this behavior are laws of general applicability which do not "target or single out the press." *Cohen,* 501 U.S. at 670, 111 S.Ct. at 2518. Therefore, ABC, as a member of the press, has no special immunity from the application of laws such as North Carolina's unfair and deceptive trade practices statute, and the First Amendment does not bar Food Lion's claims against it.

However, the fact that Food Lion's claims are not barred by the First Amendment does not mean that Food Lion may recover all of the damages that it has allegedly suffered. In its amended complaint, Food Lion alleges that it suffered damages as a result of ABC's wrongful or illegal acts as well as damages to its reputation from the publication of *Prime Time Live.* For reasons discussed above, this Court finds that Food Lion may recover damages caused by ABC's alleged wrongful and illegal acts. However, this Court also finds that based upon the Supreme Court's analysis in *Hustler,* the First Amendment bars Food Lion from recovering publication damages for injury to its reputation as a result of the *Prime Time Live* broadcast.[1]

As pointed out in the Magistrate Judge's Recommendation, Food Lion seeks to recover for injuries alleged to have been caused by ABC's *Prime Time Live* broadcast. These alleged injuries are both reputational and non-reputational in nature. According to Food Lion, these alleged injuries were the result of ABC's unlawful gathering of information and subsequent publication. Food

Lion does not allege that any of the alleged unlawfully obtained and published information was false. Instead, Food Lion contends that ABC's alleged wrongful actions in obtaining information about Food Lion are sufficient to allow Food Lion to recover both reputational and non-reputational damages regardless of whether the information published by ABC was true or false. For reasons discussed below, the Court disagrees with this contention. As discussed earlier, the Supreme Court in *Cohen* determined that the First Amendment did not bar plaintiff's claim for damages under a promissory estoppel theory. In reaching this conclusion, the Court followed a long line of cases which hold that generally applicable laws (such as promissory estoppel) "do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen,* 501 U.S. at 669, 111 S.Ct. at 2518. However, in addition to following a long line of established precedent, the Court in *Cohen* was also careful to emphasize the nature of Cohen's claim, stating:

> *Nor is Cohen attempting to use a promissory estoppel cause of action to avoid the strict requirements for establishing a libel or defamation claim.* As the Minnesota Supreme Court observed here, "Cohen could not sue for defamation because the information disclosed [his name] was true." *Cohen is not seeking damages for injury to his reputation or his state of mind.* He sought damages in excess of $50,000 for a breach of a promise that caused him to lose his job and lowered his earning capacity.

*Cohen,* 501 U.S. at 671, 111 S.Ct. at 2519 (emphasis added) (citation omitted) (quoting *Cohen v. Cowles Media Co.,* 457 N.W.2d 199, 202 (Minn.1990)). Thus, it appears that in determining that the First Amendment does not prohibit a plaintiff from recovery for a defendant's violation of a generally applicable law, the *Cohen* Court was mindful of the *type* of damages that the plaintiff sought to recov-

---

1. Although Food Lion may not recover publication damages for injury to its reputation, it may recover any non-reputational damages it allegedly suffered to the extent recoverable under North Carolina's unfair and deceptive trade practices statute and other laws governing the remaining claims.

er. Where a plaintiff sought recovery for non-reputational or non-state of mind injuries, the *Cohen* Court indicated that such a plaintiff could recover these damages without offending the First Amendment. Where, however, a plaintiff seeks to use a generally applicable law to recover for injury to reputation or state of mind while avoiding the requirements of a defamation claim (requiring proof of falsity and actual malice), the *Cohen* holding does not appear to be applicable. To the extent that Food Lion is attempting to recover reputational damages without establishing the requirements of a defamation claim, this case more closely resembles *Hustler*. In *Hustler*, the plaintiff, Reverend Jerry Falwell, sued Hustler Magazine ("Hustler") as a result of a parody in which Hustler portrayed Falwell as having engaged in a drunken sexual encounter with his mother in an outhouse. Falwell brought claims of invasion of privacy, libel, and intentional infliction of emotional distress. *Hustler*, 485 U.S. at 47–48, 108 S.Ct. at 877. The Court held that when public figures seek damages for intentional infliction of emotional distress for such satirical publications, they must establish the elements of a constitutional defamation claim (actual malice and falsity). *Id.* at 56, 108 S.Ct. at 882. In reaching its holding, the Court undertook a balancing test and determined that the First Amendment interest of the "fundamental importance of the free flow of ideas and opinions on matters of public interest and concern" outweighed the state's interest in protecting public figures from emotional distress. *Id.* at 50–56, 108 S.Ct. at 879–82. Thus, in *Hustler*, the Supreme Court determined that the First Amendment barred the plaintiff from recovering damages under the generally applicable law of intentional infliction of emotional distress.[2]

In this case, this Court agrees with the Magistrate Judge's Recommendation that Food Lion is, at least in part, attempting to recover for injury to its reputation while staying clear of the strict requirements of a defamation claim. As Judge Sharp correctly pointed out, "Food Lion seeks to recover damages for injury to its reputation (the publication damages that are characteristic of defamation actions) while avoiding the First Amendment requirements of showing falsity and actual malice." (Magistrate Judge's Recommendation at p. 30–31.) To the extent that Food Lion's damages are reputational in nature, the Supreme Court's decision in *Hustler* prevents recovery. Thus, in accordance with *Cohen* and *Hustler*, Food Lion may recover only those damages resulting from ABC's alleged trespass, fraud, unfair and deceptive trade practices, as well as those from the other remaining claims. However, Food Lion may not recover any publication damages for injury to its reputation as a result of the *Prime Time Live* broadcast.[3]

In sum, if Food Lion is ultimately successful in proving its case to a jury, it may recover non-reputational damages under

---

**2.** On its face, it might appear that *Cohen* and *Hustler* are at odds with one another. However, the *Cohen* majority expressly noted this distinguishing feature between the two cases, stating: Cohen [is not] attempting to use a promissory estoppel cause of action to avoid the strict requirements for establishing a libel or defamation claim. As the Minnesota Supreme Court observed here, "Cohen could not sue for defamation because the information disclosed [his name] was true." Cohen is not seeking damages for injury to his reputation or his state of mind. He sought damages in excess of $50,000 for a breach of a promise that caused him to lose his job and lowered his earning capacity. *Thus this is not a case like Hustler Magazine v. Falwell where we held that the constitutional libel standards apply to a claim alleging that the publication of a parody was a state-law tort of intentional infliction of emotional distress.*

*Cohen*, 501 U.S. at 671, 111 S.Ct. at 2519 (emphasis added) (internal citations omitted) (quoting *Cohen v. Cowles Media Co.*, 457 N.W.2d 199, 202 (Minn.1990)).

**3.** In paragraph 160 of its amended complaint, Food Lion alleges damages such as lost sales, profits, business opportunities and goodwill, a decrease in the value of its securities, and an increase in the cost of obtaining funds. The parties have not had the opportunity to brief the issue of the definition of "reputational damages" and which of Food Lion's alleged damages could be considered "reputational." Since the determination of what type of damages are reputational or non-reputational is not necessary for an adjudication at the 12(b)(6) stage, the Court will defer on such a ruling. Such an adjudication will be made at the time for summary judgment, if raised by the parties.

North Carolina's unfair and deceptive trade practices statute and the other laws governing the remaining claims without offending the First Amendment. The laws governing the remaining claims are generally applicable laws which do not target the press. Holding ABC accountable for any damages it allegedly caused Food Lion in violation of these laws would not violate the First Amendment. Food Lion may not, however, under the guise of some other claim, recover publication damages for injury to its reputation without establishing the defamation requirements of actual malice and falsity. Defendants' motion to dismiss all claims as violative of the First Amendment is DENIED.

## VI.

Defendant Barnett has filed a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Judge Sharp has recommended that the motion be denied. Defendant Barnett has not objected to the Recommendation. The Court adopts the Magistrate Judge's recommendation as to the 12(b)(2) motion. Accordingly, Defendant Barnett's motion to dismiss for lack of personal jurisdiction is DENIED.

## VII.

In sum, Food Lion's claims of fraud, negligent supervision, trespass, respondeat superior liability, breach of fiduciary duty and constructive fraud, unfair and deceptive trade practices, and civil conspiracy remain, albeit limited by the holding that Food Lion may not recover reputational damages. Food Lion's claims of violations of civil RICO and federal wiretapping statutes have been dismissed.

## ORDER

On April 26, 1994, the United States Magistrate Judge's Recommendation was filed and notice was served on the parties pursuant to 28 U.S.C. § 636(b). The Court has considered de novo the motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) and has reviewed the motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2).

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith, the Court hereby adopts the Magistrate Judge's Recommendation as to the Rule 12(b)(2) motion and as to the 12(b)(6) motions on claims one, two, four, five, six, seven, eight, and fourteen. The reasoning of the discussion on claim three is adopted and should be considered with the discussion contained in the memorandum opinion filed contemporaneously with this ORDER.

IT IS THEREFORE ORDERED that Defendants' motion to dismiss Plaintiff's fraud claim is DENIED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss Plaintiff's negligent supervision claim is DEFERRED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss Plaintiff's trespass claim is DENIED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss Plaintiff's respondeat superior claim is DEFERRED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss Plaintiff's breach of fiduciary duty and constructive fraud claim is DEFERRED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss Plaintiff's wiretapping claims is GRANTED.

IT Is FURTHER ORDERED that Defendants' motion to dismiss Plaintiff' unfair and deceptive trade practices claim is DEFERRED

IT IS FURTHER ORDERED that Defendants' motion to dismiss Plaintiff's civil RICO claims is GRANTED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss Plaintiff's civil conspiracy claim is DENIED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss all claims on First Amendment grounds is DENIED.

IT IS FURTHER ORDERED that Defendant Barnett's motion to dismiss for lack of

personal jurisdiction, pursuant to Rule 12(b)(2) is DENIED.